Howard E. JOHANNSSEN; Marvin E. Long; Donna Fisher, Plaintiffs–Appellees,

v.

DISTRICT NO. 1—PACIFIC COAST DISTRICT, MEBA PENSION PLAN, Defendant–Appellant.

Howard E. Johannssen; Marvin E. Long; Donna Fisher, Plaintiffs–Appellees,

v.

District No. 1—Pacific Coast District, MEBA Pension Plan, Defendant–Appellant.

Howard E. Johannssen; Marvin E. Long; Donna Fisher, Plaintiffs–Appellants,

v.

District No. 1—Pacific Coast District, MEBA Pension Plan, Defendant–Appellee.

Nos. 01–1608, 01–1986 and 01–2041.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 24, 2002.

Decided May 20, 2002.

**ARGUED:** Christine Ann Williams, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, L.L.C., Baltimore, Maryland, for Appellant. Cyril Vincent Smith, Zuck-

erman Spaeder, L.L.P., Baltimore, Maryland, for Appellees. **ON BRIEF:** Deborah S. Richardson, Zuckerman Spaeder, L.L.P., Baltimore, Maryland; Carole J. Yanofsky, Zuckerman Spaeder, L.L.P., Washington, D.C., for Appellees.

Before WILLIAMS and TRAXLER, Circuit Judges, and HALL, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

Affirmed in part and remanded in part by published opinion. Senior Judge CYNTHIA HOLCOMB HALL wrote the opinion, in which Judge WILLIAMS and Judge TRAXLER joined.

## OPINION

CYNTHIA HOLCOMB HALL, Senior Circuit Judge.

This appeal concerns pension benefits claimed by three union employees who claim eligibility for past service credits pursuant to a controversial 1992 amendment to a union staff pension plan. The claims were denied by the plan administrator who refused to recognize the validity of the amendment on the ground that it was adopted by an improper body. The employees filed suit under 29 U.S.C. § 1132(a)(1)(B) and were granted an interlocutory judgment declaring that the 1992 amendment was valid after a three day bench trial. Upon remand, a second plan administrator granted each of the employees less past service credits than they claimed, and they filed an amended complaint seeking the difference. The district court then granted the employees' motion for summary judgment in a published opinion including findings of fact and conclusions of law as to the validity of the amendment, and awarded the employees all of the past service credit they claimed. The pension plan timely appeals the validi-

ty of the amendment, the awards granted under it, and the award of attorneys' fees. The employees cross-appeal on the calculation of attorneys' fees. We affirm as to most issues but remand for recalculation of attorneys' fees and interest on the lump sum distributions awarded to the plaintiffs.

## I.

The much litigated facts serving as background to this case have been the subject of numerous decisions, including two opinions by the district court below. *See Johannssen v. District No. 1–Pacific Coast Dist.*, 1997 WL 580827 (D.Md.1987) (*"Johannssen I."*); *Johannssen v. District No. 1—Pacific Coast Dist.*, 136 F.Supp.2d 480 (D.Md.2001) (*"Johannssen II."*); *United States v. DeFries*, 129 F.3d 1293 (D.C.Cir.1997). Because much of the story has been adequately described elsewhere, we limit ourselves to a summary description.

Plaintiffs–Appellees Howard E. Johannssen, Marvin E. Long, and Donna C. Fisher (collectively the "Plaintiffs"), are three former employees of District No.1—MEBA/NMU ("MEBA/NMU"), a union formed by the merger of District No. 1–Pacific Coast District, MEBA ("PCD"), and the National Maritime Union ("NMU"). The two founding unions represented licensed merchant mariners and unlicenced seamen, respectively. In order to maintain this division of bargaining units, MEBA/NMU was structured with two divisions—the Licensed Division and the Unlicensed Division—whose membership corresponded to the old PCD and NMU. Today, MEBA/NMU is no longer in existence and the Licensed Division has once again become PCD. For simplicity of exposition, the organization representing licensed merchant mariners will be called PCD throughout the opinion except as

necessary to note instances in which its one-time status as a division of MEBA/NMU is particularly relevant.

Nominally, the Defendant–Appellant is the District No. 1—Pacific Coast District, Marine Engineers Beneficial Association Pension Plan (the "Plan"), though it is alleged that the Plan represents the interests of the current leadership of PCD in important respects. The Plan provides pension benefits to employees who are part of the union staff. Johannssen, Long, and Fisher claim 52 years past service credit under the terms governing the Plan for years worked before they became employees of MEBA/NMU.

## A. *Employment History*

From April 1968 until March 1977, Johannssen worked for the Federal Aviation Administration ("FAA") in New York. While at the FAA, Johannssen became involved in union organizing, and in 1974 began efforts to form a new union on behalf of PCD and the Professional Air Traffic Controllers Organization ("PATCO"). In 1977, Johannssen resigned from the FAA and was elected president of the newly formed Professional Airways System Specialists ("PASS"), a union that was sponsored by PCD and PATCO, and that became an affiliate of PCD in 1982. Before moving from the FAA, Johannssen was repeatedly promised by senior PCD officials that he would be awarded pension credit for his time at the FAA and PASS (which had no pension plan) as an inducement to become a full-time union organizer. To pay for costs of relocation associated with his move to the union, Johannssen thereafter withdrew his employee contributions to the federal pension plan maintained by the FAA, forfeiting the employer contributions to that plan. Between the time he left the FAA in 1977 and 1989, Johannssen accrued no pension benefits as a member of PASS. In May 1989 he became a member of the Plan and continued to be so until he terminated his employment in 1994.

Long's history is similar to Johannssen's. From 1967 to 1977 he worked as an air traffic controller at the FAA. In 1977 he resigned to work full time as an organizer for PATCO. Like Johannssen, he was promised pension credit from PCD for his years at the FAA and "cashed out" his contributions to the FAA plan. From January 1977 through December 1983, he worked at PATCO organizing unions for the benefit and under the sponsorship of PCD. While Long was at PATCO, he was a participant in the Plan and accrued approximately four years of service. However, PATCO went on strike and was eventually bankrupted in 1984, causing Long to lose the service credit he had accrued because he was not yet vested in the Plan. From 1983 to 1991, Long was employed by PASS and did not participate in the Plan. He was again promised by PCD officials that he would receive pension credit in the Plan. In 1991 he resumed participation in the Plan.

From 1971 to 1980, Fisher was employed by Boeing and its subsidiaries. From 1973 to 1980, she was also an officer of the Florida Association of Professional Employees ("FAPE"), a subordinate body of PCD. During this period she did not participate in a pension plan. From 1980 to at least the time of trial, Fisher has been an employee of PCD or MEBA/NMU, and has participated in the Plan. After beginning her employment with PCD and an affiliated union called the Federation of Public Employees ("FOPE"), Fisher sought pension credit for eight years of prior service at FAPE. In response, her supervisor told her that she would receive a salary increase only half as large as other employees at FOPE,

and that this would be offered to PCD as a way of paying part of the cost of her past service credits. Fisher has since worked under that arrangement.

## B. *The Plan*

The Plan is a defined benefit pension plan created on January 1, 1972 for the benefit of employees of PCD, through a contract between it and the John Hancock Mutual Life Insurance Company ("John Hancock"). The Plan is governed by Group Annuity Contract No. 1623 (the "Plan Document") issued by John Hancock. The Plan Document contains several provisions relevant to amendment of the Plan. At all relevant times, Article I, Section 20 provided in part: "The Employer shall have the right to amend the Plan in any respect, at any time by an instrument in writing, duly executed by the Employer...." Plaintiffs' Summ. J. Mot. Ex. 12 at I–25.0. In October 1992, when the amendment at issue was adopted, the "Employer" was defined as "the District No. 1 MEBA/NMU and its affiliated organizations listed below." Plaintiffs' Summ. J. Mot. Ex. 12 at I–1.0. Thereafter followed a list of eight associated organizations. A different provision, Article III, Section 8, provided that the "Contract," which is a synonym for the Plan Document, "may be modified at any time by written agreement between the John Hancock and the Contract Holder." Plaintiffs' Summ. J. Mot. Ex. 12 at III–3.0. It then described conditions under which John Hancock could alter the Plan Document. The term "Contract Holder" was not defined in the Plan Document. However, a copy of the contract dated February 27, 1974 included a cover page identifying PCD as the Contract Holder at that time.

From 1986 to 1996, the plan administrator was Lucille Hart. Hart reported to the president of the PCD, and for a period after the merger with NMU to the president of MEBA/NMU. At the time of the dispute, Hart was once again reporting to the leadership of the former PCD.[1] Hart was responsible for all benefits decisions and appeals. Her powers were defined in part by Article I, Section 15 of the Plan Document which stated "Except as herein otherwise expressly provided, the Plan Administrators shall have the exclusive right to interpret the Plan and decide any matters arising thereunder in connection with the administration of the Plan." Plaintiffs' Summ. J. Mot. Ex. 12 at I–24.0

## C. *The Merger*

In 1987 PCD and NMU combined pursuant to a merger agreement and referendums in both unions. The president of PCD at the time, Eugene DeFries, was a leader of the merger movement and he became the president of the new MEBA/NMU. He also became a member of the District Executive Committee (the "DEC") which was created to govern the new MEBA/NMU and, according to the merger agreement, to "assume responsibility for all matters of whatever nature whatsoever pending before" each of the merged unions as well as hold all assets and liabilities of the unions. Plaintiffs' Summ. J. Mot. Ex. 15 at 4. (Agreement of Merger). The 1991 Constitution for MEBA/NMU provides that the Divisions would be governed by

---

1. In addition to the Plan for the benefit of union employees, Hart also administered pension plans for union members. In 1991, the Fourth Circuit determined that the leadership of PCD had the right to appoint to Board of Trustees for these plans. *See Licensed Division District No. 1 MEBA/NMU, AFL–CIO v. Defries*, 943 F.2d 474 (4th Cir.1991). Although that decision did not directly concern the Plan (that is, the staff plan), the lines of authority for the Plan thereafter became an issue of contention and Hart began reporting to the leadership of PCD on Plan issues as well as on the plans for union members.

the DEC. Plaintiffs' Summ. J. Mot. Ex. 16 at 7 (1991 Constitution of MEBA/NMU).

At some point after the merger, however, it came to light that the merger was connected with corrupt practices, and that DeFries and several of his associates, including his successor as president of MEBA/NMU, Alexander "Doc" Cullison, were involved in violations of federal law. In 1993, 16 former officers of PCD and MEBA/NMU were indicted by a grand jury for a number of offenses, including election fraud related to the 1987 merger and embezzlement. The charges of election fraud related to the solicitation of open marked and unmarked election ballots from union members. In July 1995, DeFries and several others were convicted on all counts.[2] *See United States v. DeFries,* 909 F.Supp. 13, 15 (D.D.C.1995) (ordering forfeitures under RICO in consequence of convictions). Meanwhile, the growing corruption scandal, as well as efforts by the DEC to merge the pension plan covering PCD's members with the allegedly under-funded NMU pension plan, led to a revolt in the ranks of the PCD, which replaced DeFries and his cronies with a new slate of PCD leaders in 1990, approved a resolution withdrawing recognition of MEBA/NMU in January 1992, seized control of certain union assets including the hiring halls, and engaged in a series of legal disputes with MEBA/NMU.

The dissolution of MEBA/NMU followed, although there is dispute as to the actual date of its termination. On June 4, 1993, representatives of the disputing parties signed a so-called Interim Settlement Agreement ("ISA") which terminated the merger by its terms. Despite this agreement, the Plan claims that the merger was actually terminated or avoided in 1992 as the result of a referendum among union members conducted under judicial supervision. However, much of the evidence pertaining to this referendum was excluded at trial, and, as the district court noted, the multitude of lawsuits fomented by the corruption scandal—including the suit during the course of which the referendum was held—failed to achieve a clear and unambiguous restoration of the status quo ante.

### D. *The 1992 Amendment*

Though never implicated in any wrongdoing, Johannssen was a member of the DEC and all three Plaintiff's were considered to be part of the DeFries "faction" by the leadership of PCD. In October 1992, when the future of that faction was very much in doubt, the DEC voted to amend the Plan's provisions governing service credit, or the number years which count in determining pensions payable. Specifically, the DEC passed a resolution (the "1992 Amendment") amending the Plan to add text reading:

Notwithstanding anything to the contrary, Service shall be granted to all Participants for each year of Service as an employee or officer of (i) [PASS]; (ii) [PATCO] or its subordinate bodies; (iii) [POID] or its subordinate bodies; (iv) service with a contracted employer of District No.1–MEBA/NMU or one of its affiliates; (v) and the American Federation of Government Employees (AFGE) or its subordinate bodies; provided that the participant has not received service credit with respect to any other pension plan in which the participant is entitled to an accrued benefit.

The purpose of the 1992 Amendment was to provide pension benefits to the Plaintiffs and it was tailored to their employment histories.

---

**2.** The remaining defendants subsequently pleaded guilty to various charges including mail fraud in connection with the 1987 merger.

After the resolution was adopted, Cullison, who was then president of MEBA/NMU, informed both John Hancock and Hart, by letter dated December 1, 1992, that MEBA/NMU had voted to amend the Plan to grant prior service credits to certain participants. Cullison also provided John Hancock with the text of the 1992 Amendment and instructed it to prepare the required documents for incorporation of the amendment into the Plan Document. At that time neither Hart nor John Hancock objected, and an amendment was prepared by John Hancock and signed by Cullison. However, Hart subsequently refused to recognize the validity of the 1992 Amendment. In January 1993, sometime after Cullison had returned the signed amendment to John Hancock, Hart contacted Charles Harootunian of John Hancock and demanded that the amendment be disregarded. Harootunian's hand-written notes of this conversation state that Hart requested that the amendment be disregarded because of "internal politics." Plaintiffs' Summ. J. Mot. Ex. 36. John Hancock notified the District of Columbia Insurance Commission, asking that the 1992 Amendment be removed from its files and deemed rescinded.

### E. *Proceedings Below*

After receiving their 1993 pension statements, the Plaintiffs contacted the Plan to determine why they had not received their past service credits. In a letter dated March 30, 1994, Hart notified Fisher that she was not entitled to additional service credit because FAPE "was not and is not a participating Employer in the Staff plan." Plaintiffs' Summ. J. Mot. Ex. 39. In a follow up letter, Hart advised Fisher that the 1992 Amendment was not part of the plan. Hart also notified Johannssen and Fisher that they were not entitled to any service credit because the 1992 Amendment "is not, and was not at any time, part

of the Staff Plan." Plaintiffs' Summ. J. Mot. Ex's. 37 & 38.

In 1996, the Plaintiffs filed joint suit to force the plan administrator to enforce the terms of the 1992 Amendment. Both sides' Motions for Summary Judgment on the validity of the 1992 Amendment were denied in a published opinion filed August 8, 1997, and a 3–day bench trial followed. In March, 1999, the district court issued an Interlocutory Declaratory Judgment holding the 1992 Amendment valid and ordering the plan administrator to determine the Plaintiff's eligibility for past service credits pursuant to it.

The plan administrator, by that time Allen Szymczak, sent his determinations to Plaintiffs on July 1, 1999. Johannssen and Long were each given 12 years credit and Fisher was given no credit. Past credit for Johannssen and Long was denied for the years they worked at the FAA because they had participated in the FAA's pension plan and because the FAA was not technically a contracted employer of MEBA/NMU's but rather of its predecessor. Additionally, their years as officers of affiliated unions were not credited because Szymczak determined that the plan required 1,000 paid hours of union work to obtain annual pension credit and Johannssen and Long were not paid as officers. Fisher was also denied credit based on the 1,000 paid hours requirement. After exhausting internal appeals, Plaintiffs filed an amended complaint seeking the difference and both sides again moved for summary judgment.

On March 29, 2001, the district court filed an order and judgment which included a statement of findings of fact and conclusions of law as to the validity of the 1992 Amendment. It also found that Szymczak had abused his discretion in interpreting the 1992 Amendment and

granted Plaintiffs most of the past service credits they sought. On July 10, 2001, the district court issued an Amended Order specifying an award in the amount of $2,233,571.21. The same day it also issued an order granting attorneys' fees to the Plaintiffs in the amount of $243,789.98. This appeal followed.

## II.

### A. *Standard of Review*

The Plan denies the validity of the 1992 Amendment on the ground that the DEC was not authorized under the Plan Document to amend its terms. It would thus have us affirm Hart's decision denying the Plaintiffs any past service credits. Before we can reach that question, however, we must tackle the thorny question of the appropriate standard of review for the district court and ourselves.

■ The district court treated the validity of the 1992 Amendment as a legal issue for plenary or *de novo* review. The Plan argues that this was error because Hart's decision not to recognize the 1992 Amendment was within the scope of discretionary powers conferred on her by the Plan Document. It claims that Hart, in rejecting the amendment, was essentially interpreting the terms "Employer" and "Contract Holder" as they applied to those sections of the Plan Document which set out who may amend the Plan. Under this framing of the issue, Hart's instruction to John Hancock to disregard the 1992 Amendment was allegedly based on her finding that neither of these terms applied to the DEC and that it consequently had no power to unilaterally amend the Plan. Because the Plan frames Hart's actions as based on her power of interpretation, it argues that the district court was limited to reviewing her actions for abuse of discretion under *Firestone Tire and Rubber Co. v. Bruch,*

489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

■ In the paradigmatic action under 29 U.S.C. § 1132(a)(1)(B), review of a plan administrator's benefits determination is governed by the framework established in *Firestone.* In that seminal case, the Supreme Court noted that "although it is a comprehensive and reticulated statute, ERISA does not set out the appropriate standard of review." *Id.,* 489 U.S. at 108–09, 109 S.Ct. 948 (internal quotations omitted). The Supreme Court therefore filled in the gap using trust principles to establish the general rule that benefits determinations based on plan interpretations are to be reviewed *de novo* as courts construe the terms of trust agreements without deference to either party's interpretation. 489 U.S. at 112, 109 S.Ct. 948. However, a deferential "abuse of discretion" review is used when the benefit plan gives the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan" because a trustee may be given discretionary power to construe ambiguous terms of a trust. *Id.* at 111, 115, 109 S.Ct. 948.

■ Thus, a reviewing court must initially decide *de novo* whether the plan's language grants the administrator discretion and whether the administrator acted within the scope of that discretion. *Feder v. The Paul Revere Life Ins. Co.,* 228 F.3d 518, 522 (4th Cir.2000); *Haley v. The Paul Revere Life Ins. Co.,* 77 F.3d 84, 89 (4th Cir.1996). If the reviewing court determines that the language of the plan does grant discretion in a particular area, it reviews decisions taken under that grant for abuse thereof. *Id.* In all other cases review is *de novo.*

While there is no dispute that Hart was given broad authority in the Plan Document to interpret the Plan and decide matters of administration under it, we do

not believe that trust principles or the rule in *Firestone* extend so far as to require judicial deference in this case. Hart's actions exceeded the scope of her discretionary authority. For one thing, we are highly skeptical as a factual matter that the process that she engaged in was one of plan interpretation. There is little or no evidence that Hart made any undertaking to interpret the terms of the Plan Document at all. The record shows that Hart did not scrutinize or even pay much attention to the use and meaning of the terms "Employer" and "Contract Holder" in the Plan Document. Rather, Hart testified that it was her belief prior to the internal strife at the union that MEBA/NMU *did* have authority under the terms of the Plan Document to make unilateral amendments. In deciding to ignore the 1992 Amendment, Hart seems simply to have concluded—based on the advise of counsel for the insurgent faction at PCD as well as this Circuit's 1991 opinion concerned with a separate benefit plan for union members—that MEBA/NMU no longer represented the union and could not therefore control the Plan. Although PCD now argues that this conclusion depends in part on finding PCD to be the "Contract Holder" (an undefined term in the Plan Document), it ultimately hinges on a determination as to whether MEBA/NMU was the legal successor to PCD as the plan sponsor and whether the merger was somehow legally avoided prior to passing the 1992 Amendment.[3] Such legal questions are appropriate terrain for the courts, not plan administrators, and when eligibility determinations turn on questions of law we have not hesitated to apply a *de novo* standard of review. *See Gauer v. Connors*, 953 F.2d 97, 99 (4th Cir.1991).

■ Moreover, even if we did accept that Hart was nominally engaged in interpreting the terms of the pension plan, we would still not accept the Plan's claim for deferential review in this context. This Circuit has stated that the deferential standard reflects our recognition of the greater institutional competence plan administrators possess relative to our own within their area of expertise. *See Berry v. Ciba–Geigy Corp.*, 761 F.2d 1003, 1006 (4th Cir.1985); *Richards v. United Mine Workers of America Health and Retirement Funds*, 851 F.2d 122, 123 (4th Cir. 1988); *Quesinberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1022 (4th Cir.1993) (en banc). "The standard exists to ensure that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure is episodic and occasional." *Berry*, 761 F.2d at 1006. A plan administrator's area of competence is in the application of plan terms to the factual circumstances of particular claims and the day to day administration of the plan. It is not in the determination of which contending slates of leaders representing different entities is entitled to speak as legal successor to the status of "Contract Holder."

The Supreme Court's guidance in *Firestone* does not require a contrary result. In that case, the Court was writing against the background of a widespread practice in federal courts of applying the arbitrary and capricious standard to benefits decisions regardless of whether the plan specifically conferred discretion to interpret the plan to its administrator(s) or not. As *Firestone* recognized, that practice developed in part in response to the Congressional purpose in passing ERISA to promote internal resolution of claims

---

**3.** Indeed, we think it telling in this regard that the Plan was unable to articulate a coherent interpretation of the Plan Document giving

PCD rather than MEBA/NMU the authority to amend the Plan to either us or the district court below.

and encourage informal and nonadversarial proceedings. *See Firestone,* 489 U.S. at 114–115, 109 S.Ct. 948; *see also Berry,* 761 F.2d at 1007; *Grossmuller v. International Union, UAW Local 813,* 715 F.2d 853, 857 (3d Cir.1983). While recognizing this policy, *Firestone,* 489 U.S. at 115, 109 S.Ct. 948, the Supreme Court nevertheless found it outweighed by other considerations, namely: 1) the Congressional intent that the courts be guided by trust law principles in developing federal common law under ERISA, 2) the principle that the duties and powers of a trustee may be determined by a court's plenary review of a trust document, and 3) the duty to impose a standard that would at least preserve the pre-existing level of employee protection in light of Congress' purpose to promote the interests of employees and their beneficiaries in benefits plans. *See Firestone,* 489 U.S. at 110–12, 109 S.Ct. 948. However, because the Court found that it was to be guided by trust law, it also held that deference is to be given when it is required in accordance with the trust principle that a trustee may be given discretion to interpret terms of the trust. *Id.* at 111, 109 S.Ct. 948.

*None* of these policies provides justification for granting deference here. Employee protection is furthered by more, rather than less scrutiny of conflicts in which both sides have mixed and partisan motives. The Congressional policy favoring internal resolution of benefits claims can not reasonably be interpreted to require us to give deference to the plan administrator as one of the parties in a conflict in which it is essentially a direct participant. As for principles of trust law, the rule that a court will respect the discretion conferred on a plan administrator as trustee can not apply when the issue is whether the plan administrator can frustrate the authority of the entity claiming the power to control the terms of that very discretion.[4] In such a case, the discretionary powers given to a trustee run up against the duty to obey powers of control reserved by the trust settlor. *See Restatement (Second) of Trusts* §§ 185, 330 (1959) (describing a trustee's duty with respect to a person reserving the power of control or revocation). While a plan administrator can, and indeed may be obligated to resist a benefits award that she believes to be the product of an illegitimate attempt to amend the plan, the proper resolution of such a conflict must remain with the courts sitting in their plenary capacity, and the parties' recourse is to apply to the courts for instructions. *See Firestone,* 489 U.S. at 112, 109 S.Ct. 948; *Restatement (Second) of Trusts* § 185 comment e (1959).

Other authorities cited by the Plan, *Curtiss–Wright Corp. v. Schoonejongen,* 514 U.S. 73, 82, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995), and *Hutchins v. Champion Int'l Corp.,* 110 F.3d 1341 (8th Cir.1997), are similarly unavailing to its position. In *Curtiss–Wright* the Supreme Court recognized the importance of requiring pension plans to have written procedures for amending plan provisions and identifying the persons with authority to make such amendments. 514 U.S. at 82, 115 S.Ct. 1223. In this regard the Court recognized that "having an amendment procedure enables plan administrators ... to have a mechanism for sorting out, from among the occasional corporate communications that pass through their offices and that conflict with existing plan terms, the bona

---

4. Nor are we convinced that it was the intent of the plan sponsor, originally PCD, to permit such a result. There is no obvious rationale providing a basis to conclude that the plan sponsor would so want to limit its own explicitly reserved authority, and every reason to think that it would not do so.

fide amendments from those that are not." *Id.* The Court further recognized that "plan administrators may have a statutory responsibility to do this sorting out." *Id.* However, as the district court correctly noted, this falls far short of conferring a blanket authority to ignore amendments which are at least ostensibly made in conformance with the procedure provided for in the Plan Document and protecting that authority behind a shield of judicial deference. *Curtiss–Wright* speaks to a plan administrator's duty to run the plan in accordance with its documents (including amendment procedures) not to the scope of a grant of discretion.

*Hutchins* dealt with the authority of a plan administrator to amend a disability plan in order to exclude benefit payments to incarcerated criminals. 110 F.3d at 1343. The relevant plan provision reserved the right of plan amendment to the employer's board of directors, but added that "any amendment which is not a substantive amendment shall be made on behalf of [the employer] by the [plan administrator]." *Id.* The Eighth Circuit granted deference to the plan administrator's determination that his amendment was not a substantive one, finding his interpretation of the word "substantive" reasonable. *Id.* at 1344–45. *Hutchins* is distinguishable because the plan administrator in that case was merely interpreting the scope of its own powers, not attempting to limit those reserved for the employer. It thus does not involve the conflict of powers in a trust that compels us in this case to adjudicate the issue without granting deference to one of the sides.

Finally, even apart from the general question of the applicability of the rule in *Firestone* to this context, we would still apply *de novo* review in this case due to the plan administrator's palpable conflict of interest. Though *Firestone* directs

abuse of discretion review of plan interpretations made under expressly granted discretionary power, it also cautioned that where a conflict of interest is manifest, such a conflict should be factored into the judicial review process. 489 U.S. at 115, 109 S.Ct. 948; *see also Booth v. Wal–Mart Stores Inc.,* 201 F.3d 335, 341 (4th Cir. 2000); *Doe v. Group Hospitalization & Medical,* 3 F.3d 80, 86–87 (4th Cir.1993). In this case, Hart had a clear conflict of interest because she considered herself to be responsible to the management of PCD, which has demonstrated through the course of this litigation that it considers this issue as an extension of its bitter campaign against MEBA/NMU. Moreover, Hart imported PCD's conflict into her determination by relying entirely on the opinion from PCD and its counsel that MEBA/NMU was not authorized to amend the Plan. Thus, we would in any event reduce the degree of deference to the extent necessary to neutralize the untoward influence of PCD on her decision. *Doe,* 3 F.3d at 87. Given the source of that decision, our review, once again, is *de novo.*

#### B. *Validity of the 1992 Amendment*

■ Having determined that the district court applied the correct standard of review, we must now review its substantive finding that the DEC validly amended the Plan Document. In doing so, we review the district court's interpretation of plan documents *de novo* since contract interpretation is a question of law. *See Hendricks v. Central Reserve Life Insurance Co.,* 39 F.3d 507, 512 (4th Cir.1994). To the extent that the district court relied on an evaluation of evidence extrinsic to the contract, our review of the findings of fact based on that evidence is for clear error. *Id.* A district court conducting *de novo* review may at its discretion review evidence that was not before the plan administrator when doing so is necessary to

interpret the terms of a plan. *Quesinberry*, 987 F.2d at 1027.

█ As we have noted above, Article I, Section 20 of the Plan Document reserves for the "Employer" the right to amend the Plan by a duly executed instrument in writing. When the 1992 Amendment was adopted, the "Employer" was defined as "MEBA/NMU and its affiliated organizations listed below." While this set of provisions clearly associates MEBA/NMU with the term "Employer," it leaves ambiguous whether MEBA/NMU could amend the Plan unilaterally through the DEC, or whether it was required to act in concert with the listed affiliated organizations.[5] The term "Employer" has multiple functions in the much amended Plan Document and there are several instances in which its use seems to shift between singular and plural.[6]

The district court resolved that ambiguity by use of extrinsic evidence. It noted that prior to the 1998 trial, the Plan itself argued at the summary judgment stage that one organization had the power to amend the Plan and framed its argument in terms of whether that union was PCD or MEBA/NMU. It further found, based on Ms. Hart's own testimony, that she had

formerly construed the provisions of the Plan to vest sole authority to amend the Plan in a single union which could act without the vote, concurrence, or input of any affiliated unions. In line with that understanding, the district court observed that the historical record showed that a single entity had always amended the Plan without the participation of the affiliated unions listed in Article I, Section 20, detailing several examples in which either PCD or MEBA/NMU, depending on whether it was before or after the merger, had unilaterally adopted amendments.[7] Based on these findings, the district court concluded that the first entity listed in the definition section under "Employer," i.e. MEBA/NMU in 1992, was actually the "Employer" for amendment purposes.

The Plan does not challenge this interpretation directly, but rather makes a collateral attack by contending that it was error for the district court to additionally interpret the term "Contract Holder" as a mere linguistic device synonymous to "Employer" and used to avoid confusion when the term "any Employer" was used in the same paragraph. It will be recalled that Article III, Section 8 of the Plan Document permitted the "Contract" to be

---

5. Section 402(b)(3) of ERISA, 29 U.S.C. § 1102(b)(3), requires that plans provide for a procedure for amending the provisions of the plan and identifying the persons who have authority to authorize such amendments. The terms of § 402(b)(3) are indifferent to the level of detail in an amendment or identification procedure. *Curtiss Wright*, 514 U.S. at 80, 115 S.Ct. 1223. The parties have not challenged the adequacy of the amendment procedure provided in this case.

6. For example, "Employee" is defined in the Plan Document as "an individual in the employ of the Employer" suggesting use of the term to describe the multiple entity including all unions. Plaintiffs' Summ. J. Mot. Ex. 12. Other sections use the singular meaning, such as Article III, Section 11 which states "nei-

ther the Contract Holder, any Employer nor any Plan Administrator shall be considered the agent of John Hancock for any purpose under this Contract." *Id.*

7. For example, in 1988 the DEC voted to add employees of the pre-merger NMU as participants of the plan and give them past service credit in the Plan for vesting and participation purposes. Plaintiffs' Summ. J. Mot. Ex. 17 (December 22, 1988 resolution of the DEC). In a second post-merger case, the DEC added a new participating employer, the National Air Traffic Controllers Association ("NATCA") to the Plan. Plaintiffs' Summ. J. Mot. Ex. 19. In both cases, Hart promptly recognized the decisions of the DEC as binding and effective.

modified by written agreement between the John Hancock and the "Contract Holder." Although the Plan's claims about the import of this language are murky to say the least, they can be read to claim that PCD was in fact the "Contract Holder" in 1992, and that the evidence that a single entity historically made amendments without the participation of the affiliated unions should be interpreted to reflect the fact that they were made pursuant to the powers of the "Contract Holder" rather than the "Employer."

We agree that the district court erred in interpreting the term "Contract Holder" as a mere linguistic device used as an alternative where use of the term "Employer" would have been confusing. As the Plan correctly points out, such an interpretation would make certain provisions of the Plan Document duplicative. For example, Article III, Section 4 provides:

> The Contract Holder, any Plan Administrator, any Employer, any Participant, and any payee shall furnish all information and proofs which the John Hancock may reasonably require in the administration of this Contract.

Plaintiffs' Summ. J. Mot. Ex. 12 at III–1.0. Under the district court's reading, this section would redundantly place an obligation on any of the entities listed under the definition of Employer and also on all of the entities together as a group. In addition, we note that the term "Contract Holder" appeared in the original Plan Document when the Plan was a single employer plan and before the term "Employer" was used to describe a compound entity. Based on these facts, we find that "Con-

tract Holder" is not a mere synonym for "Employer" but rather is an appellation that was originally given to PCD in 1972 as the plan sponsor.[8]

Nevertheless, this does not help the Plan because its challenge is not ultimately to the interpretation of "Contract Holder" but rather to the district court's finding that the 1992 Amendment was validly adopted by MEBA/NMU through the DEC. This challenge still fails for three reasons.

First, the district court did not merely find that a single entity had always amended the Plan. It specifically found that MEBA/NMU was understood to be the entity authorized to adopt amendments post-merger, as it had done so on at least the two occasions described above. While this does not preclude the possibility that MEBA/NMU was acting as "Contract Holder" rather than "Employer," it does preclude the Plan's implicit argument that PCD, which was the undisputed "Contract Holder" before the merger, continued in this status after the merger.[9] The historical practice of the Plan shows that MEBA/NMU gained the power to amend the plan in 1988 as either the "Employer," "Contract Holder," or both.

Second, we agree based on our reading of the Plan Document as a whole that the intent of its drafters was to allow MEBA/NMU to exercise its amendment power as "Employer," not merely "Contract Holder." The Plan Document consists of three "Articles," each containing multiple sections. Article I, which contains the definition for "Employer" and grants amend-

---

**8.** 29 U.S.C. § 1002(16)(B) defines "plan sponsor" as the entity by which the plan is "established or maintained."

**9.** As noted above, "Contract Holder" is not a defined term in the Plan Document. However, the cover sheet to the original contract

with John Hancock lists PCD as the Contract Holder along with the date and the contract number. Appellant's brief may be read to argue that this fact signifies that PCD was the original Contract Holder and still maintained this status in 1992.

ment power to that entity, is entitled "the Plan." This article contains sections on matters having to do with the terms of Plan eligibility, credits, vesting, and the like. Article III, which is termed "General Provisions," primarily covers matters of mutual rights and responsibilities of John Hancock and the "Contract Holder." The term "Employer" and "Plan" are consistently used in Article I, whereas "Contract Holder" and "Contract" are consistently used in Article III. The Plan Document also defines the term "Plan" as "the pension plan funded under this Contract as defined in Article I." This structure demonstrates an intent to vest the power to amend the terms of benefit eligibility primarily in the "Employer."

Correspondingly, when read *in toto,* it is clear that Article III, Section 8 is intended primarily for the benefit of John Hancock rather than as a reservation of amendment power in the Contract Holder. That section refers to modifications of the "Contract" and specifies that they will be made by written agreement between John Hancock and the Contract Holder. The section further specifies that "The John Hancock shall have the right to modify this Contract in any respect upon written notice to the Contract Holder," identifies the office holders at John Hancock who have the authority to take action on its behalf, and discusses John Hancock's right to modify the purchase rates of pension benefits. Plaintiffs' Summ. J. Mot. Ex. 12 at III–3.0. In light of these limitations, we find that the drafters intended that Plan amendments be adopted pursuant to the "Employer's" Article I powers, and that those powers were conferred upon MEBA/NMU when it was substituted for PCD on the first line of the "Employer" definition consistent with the general transfer of powers from PCD to MEBA/NMU during the merger.

Third, the evidence shows that following the merger, MEBA/NMU was *both* the "Employer" and the "Contract Holder." The Agreement of merger made MEBA/NMU the legal successor to PCD by merging NMU into PCD and changing its name to MEBA/NMU. Pursuant to the merger and MEBA/NMU's constitution, all of the assets and liabilities of PCD were held by MEBA/NMU and the newly created Licensed Division was governed by, and subordinate to, the DEC. Consistent with this fact, the Plan's mandatory annual filings with the IRS, Department of Labor, and the federal Pension Benefit Guaranty Corporation identified MEBA/NMU as the "plan sponsor" for the years 1989 through 1992. When PCD was originally identified as the "Contract Holder" on the cover sheet to the 1974 version of the Plan Document, it was so labeled in its capacity as plan sponsor.

Despite this evidence of the Plan Document's history and structure, the Plan has throughout this litigation searched for some equitable or doctrinal peg on which to hang its hope that we would find the 1992 Amendment void *ab initio* by reason of fraud and wrongdoing in connection with the 1988 merger. On appeal before us it attempts to articulate a theory that PCD somehow reverted to its former status as "Contract Holder" as a result of such fraud. Even aside from the fact that this argument would not reach MEBA/NMU's status as "Employer," we find that the Plan has failed to articulate or provide evidence for any theory that would allow us to effectively undo the 1988 merger in the context of an ERISA benefits action.

## III.

Having affirmed the validity of the 1992 Amendment, we must next consider its application. After trial on the prior issue, the district court issued an interlocutory

order declaring the 1992 Amendment valid and remanded Szymczak to apply the Amendment to determine the amount of service to be credited to each of the Plaintiffs. Szymczak found that Johannssen and Long were each entitled to 12 years past service credit rather than the 21 and 23 years that they claimed respectively. He also found that Fisher was not entitled to any past service credit when she had requested 8 years. The Plaintiffs then returned to district court and obtained summary judgment. The district court found Szymczak's benefits determination to be an abuse of discretion, and granted Johannssen, Long, and Fisher the 21, 23, and 8 years of past service credit, that they respectively claimed. The Plan challenges the district court's finding that Szymczak abused his discretion.

We review the district court's decision *de novo,* employing the same standards properly applied by it. *Bernstein v. CapitalCare, Inc.,* 70 F.3d 783, 787 (4th Cir. 1995).

██ To repeat, the 1992 Amendment reads as follows:

> Notwithstanding anything to the contrary, Service shall be granted to all Participants for each year of Service as an employee or officer of (i) [PASS]; (ii) [PATCO] or its subordinate bodies; (iii) [POID] or its subordinate bodies; (iv) service with a contracted employer of District No. 1–MEBA/NMU or one of its affiliates; (v) and the American Federation of Government Employees (AFGE) or its subordinate bodies; provided that the participant has not received service credit with respect to any other pension plan in which the participant is entitled to an accrued benefit.

Szymczak read this language to provide less past service credit than the Plaintiffs believe is their due, for three reasons. First he read the proviso to the amendment to exclude credit for years in which a Participant had accrued pension credits in another plan even if the Participant never received and was not entitled to any payment based on that credit.[10] Second, he read item (iv.) above to exclude service with the FAA and Boeing, which were technically contract employers with PCD as the predecessor union to MEBA/NMU rather than MEBA/NMU itself. Finally, Szymczak imposed a "1,000 hours" paid service rule to eliminate any years of past service credit in which a Participant was not employed by a covered entity or received less than 1,000 hours compensation at minimum wage. Szymczak derived this rule from reading several provisions together. Although he did not believe that the term "Service" in the 1992 Amendment was a defined term in the Plan Document,[11] Szymczak read it as consistent with the term "Year of Vesting Service" which he believed required 1000 "Hours of Service." "Hour[s] of Service" were defined as "hour(s) for which an Employee is paid or entitled to payment."[12] Thus,

---

10. This reading effectively eliminated Johannssen and Long's claims for pension credit for the nine years they each worked at the FAA.

11. In fact, this proved to be an error. Rather than the version of the Plan Document in effect in 1992, Szymczak interpreted a 1996 restatement of the Plan Document. In that restatement, the term "Service" was apparently undefined. However, in the correct document the term was defined. The correct

document defines "Service" by reference to the term "Year of Service" with respect to periods after January 1, 1976. For periods prior to that time, "Service" is not defined in this manner, but rather is determined in accordance with the terms of the prior plan.

12. The term "Year of Vesting Service" was not in fact a term of the Plan Document in 1992, but was rather a term used in the 1996 restatement incorrectly used by Szymczak. In 1992, the correct term was "Year of Ser-

Szymczak read "year of Service" in the 1992 Amendment as equivalent to a "Year of Service" or 1000 hours of paid employ.[13]

■ This time around, review of the plan administrator's decision is, in fact, governed by the standard established in *Firestone* since Szymczak's benefits determination was the product of an interpretation of the 1992 Amendment. Moreover, it is also guided by *Booth v. Wal–Mart Stores Inc.*, 201 F.3d 335, 340–43 (4th Cir. 2000). In *Booth,* this Circuit set out 8 non-exclusive factors that a court may consider to determine the reasonableness of a fiduciary's discretionary decision under ERISA:

(1) the language of the plan;

(2) the purposes and goals of the plan;

(3) the adequacy of the materials considered to make the decision and the degree to which they support it;

(4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan;

(5) whether the decisionmaking process was reasoned and principled;

(6) whether the decision was consistent with the procedural and substantive requirements of ERISA;

(7) any external standard relevant to exercise of discretion; and

(8) the fiduciary's motives and any conflict of interest it may have.

*Id.* at 342–43. Conflict of interest may serve both to reduce the degree of deference a court will grant to a discretionary decision of a fiduciary and as a factor in the reasonableness inquiry. *Id.* at 343 n. 2.

■ Applying *Booth,* the district court first determined that Szymczak was seized of a conflict of interest. We agree. Much like Hart before him, Szymczak relied heavily on biased information in making his determination. Specifically, he relied on defense counsel to select documents from trial and other sources to be used in interpreting the 1992 Amendment. In so doing, he imported PCD's interest into his deliberation process, making its conflict his own. Also like Hart, a conflict of interest was present for Szymczak because he was aligned with the leadership of PCD and the litigation position of the Plan that the 1992 Amendment was invalid as an extension of criminal activities associated with the "DeFries faction."[14] Szymczak himself indicated that he was indeed seized of this conflict through statements at deposi-

---

vice." Like "Year of Vesting Service," the term "Year of Service" was also defined in terms of 1000 "Hours of Service." However, as noted in the previous footnote, the term "Year of Service" was only connected with the term "Service" in the correct version of the Plan Document for plan years beginning in 1976. The bulk of the past service credits that were excluded by Szymczak by use of the "1,000 hours" rule was for years prior to 1976.

13. This requirement redundantly excluded past service credit to Johannssen and Long for the unpaid union organizing they performed while still employees at the FAA and also eliminated all past service credit claimed by Fisher who had been unpaid at FAPE.

14. We do not say that the fact that Szymczak reported to PCD was alone sufficient to establish a conflict of interest. In general, the fact that a plan fiduciary is employed by or serves at the will of the plan sponsor will not be deemed to create a conflict of interest automatically raising a presumption of bias. *See de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1191–92 (4th Cir.1989). However, given the manifest treatment of this litigation by the Plan as an extension of the course of litigation against MEBA/NMU by PCD and Szymczak's identification with that position, it is clear that Szymczak's relationship with PCD was sufficient in this case to create a conflict of interest.

tion espousing the Plan's position that the 1992 Amendment was an invalid exercise tied to criminal activities in MEBA/NMU. Def. Cross Mot. Summ. J. Memo. Ex. G. at 173, 186.[15] Although Szymczak also said that he had no "personal" belief as to the validity of the 1992 Amendment, this attempt to distinguish personal belief from his position as plan administrator was merely a self-serving device to protect his decision from scrutiny, and as such creates no genuine issue of fact as to his conflict.

Having correctly determined that there was a conflict of interest, the district court then methodically applied the factors in *Booth* detailing a litany of undisputed facts demonstrating the invalidity of Szymczak's three reasons for denying part of the past service credit demanded by the Plaintiffs. We are in complete agreement with the district court's well reasoned and written opinion on this issue. *See Johannssen II*, 136 F.Supp.2d at 504–510. Therefore rather than repeat the district court's full analysis, we shall merely summarize the main points below.

First, as to the proviso denying service credit for any year in which the Participant received credit in another plan and was entitled to an accrued benefit, the district court found that Szymczak disregarded the clear meaning of the word "benefit." Szymczak interpreted the proviso to mean that Plaintiffs were not entitled to credit for years in which they had "accrued a vested benefit" from the FAA. However, Johannssen and Long were not

entitled to any benefit from their participation in the federal pension plan maintained by the FAA. When each left the FAA, he withdrew his employee contribution to his account, thereby incurring a tax liability (which each paid) and forfeiting any right to the employer contribution. Thus, neither received any "benefit." They received only their deferred salary.

Second, Szymczak also disregarded the language of the 1992 Amendment in his interpretation of "service with a contracted employer of District No. 1–MEBA/NMU or one of its affiliates" (item iv.), and decision to apply the 1,000 hour rule because each effectively nullified clauses of the 1992 Amendment. Szymczak interpreted item iv. to refer only to contracted employers of the merged union entity rather than that entity and its predecessors. In doing so, Szymczak effectively nullified the clause itself since no one would obtain credit under his interpretation. Szymczak's notes indicate that he knew that his narrow interpretation was made possible by what was at most a scrivener's error not indicative of the intent of the drafters. Plaintiffs' Summ. J. Mot. Ex. 17. As to the 1,000 "Hours of Service" requirement, this effectively read service "as an officer" out of the amendment because it relied on provisions relevant to "Employees."[16] Moreover, even as to "Employees" this requirement did not apply for years prior to 1976, a fact Szymczak would have

---

**15.** Szymczak also signaled his conflict in his determination letter of November 19, 1999, in which he explained to Plaintiffs that past credit would be denied in part based on the distinction between employees of (pre-merger) PCD and those of MEBA/NMU and its affiliates, a distinction which he noted, was "central to this litigation" along with the question of who had the right to amend the Plan. Defendant's Cross Mot. Summ. J. Ex. D. at 2.

**16.** If one were paid by the union for 1,000 hours or more, one would be entitled to credit as an "Employee." If one worked as an unpaid officer, as these union's officers often did during the relevant period, the Amendment would not apply on Szymczak's interpretation.

known had he read the correct version of the Plan Document.[17]

The district court also found that Szymczak considered inadequate materials, that his interpretation was inconsistent with prior and subsequent interpretations of the Plan, and that his decision making was neither "reasoned" nor principled. *See id.* at 507–508. Though the reasons should already be largely clear from what has been said above, readers are referred to the district court's opinion for greater detail. We affirm the district court's finding that Szymczak abused his discretion and thus preserve its award of past service credit to the Plaintiffs.[18]

## IV.

 The Plan also challenges the district court's award of lump sum distributions to the Plaintiffs and award of prejudgment interest. The Plan allows participants to receive their pension payments as lump sum distributions. The district court calculated that such lump sum distributions would have been due and payable to Johannssen and Long in April 1996 and to Fisher in September 1995 and ordered the payment of prejudgment interest from those dates. The Plan asserts that this determination was erroneous because such payments are not available under the terms of the Plan until a participant has reached the age of 55. The district court did fail to consider retirement age and thus granted the lump sums too early. Johannssen was born 1/2/43 and Long was born 1/4/43, making them 55 on 1/2/98 and 1/4/98 respectively. Fisher's date of birth is not contained in the record. We there-

fore remand for the district court to recalculate the Plaintiffs' monetary awards consistent with the correct dates for lump sum distributions.

## V.

 Finally, both sides challenge the district court's award of attorneys' fees. The Plan challenges its decision to award any attorneys' fees and we review this determination for abuse of discretion. *See Denzler v. Questech, Inc.,* 80 F.3d 97, 104 (4th Cir.1996). While it disputes the court's application of each of the factors that it must consider in making such a determination, it primarily challenges the finding that it acted in bad faith. Such a finding is reviewed for clear error. *Hyatt v. Shalala,* 6 F.3d 250, 255 (4th Cir.1993). Attorneys for the Plaintiffs challenge the amount of the award of fees on the ground that the district court erred by awarding fees at historical rather than current rates. They also claim that it abused its discretion by failing to grant their claim for an enhancement due to rare and exceptional results. The reasonableness of the amount of a district court's fee award is reviewed for abuse of discretion. However, questions of law that arise in the course of such a determination are reviewed *de novo. See e.g., Smyth v. Rivero,* 282 F.3d 268, 274 (4th Cir.2002); *Alexander v. Boyd,* 113 F.3d 1373, 1381 (4th Cir.1997).

 ERISA provides that a "court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The Fourth Circuit has established 5 factors which a court must consider in exercising

---

**17.** Szymczak reviewed the Plan Document in effect in 1996 rather than 1992 (see *supra* nn. 11, 12).

**18.** The Plan has not challenged either the substance of the district court's independent

reading of the 1992 Amendment or its discretion to determine the proper award of past service credits based on the record before it rather than remanding for yet another benefits determination by the plan administrator.

this discretion. *Reinking v. Philadelphia American Life Ins. Co.*, 910 F.2d 1210, 1217–1218 (4th Cir.1990). These are:

(1) degree of opposing parties' culpability or bad faith;

(2) ability of opposing parties to satisfy an award of attorneys' fees;

(3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;

(4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

(5) the relative merits of the parties' positions.

*Id.; Quesinberry*, 987 F.2d at 1028.

The 5 factors are general guidelines only, and some may not be relevant in some contexts. *Quesinberry*, 987 F.2d at 1028. However, the district court is required to address all 5 in order to ensure an adequate basis for review. *See id.*

 In applying the first factor, the district court found that the Plan exercised bad faith in applying the 1992 Amendment in a biased manner reflecting the on-going political fight and litigation between PCD and MEBA/NMU. The Plan challenges this finding with the novel argument that it lacked a factual basis because the underlying dispute was decided on summary judgment. The Plan essentially argues that the legal requirement that all evidence of the non-movant must be believed and all justifiable inferences drawn in its favor when ruling on a motion for summary judgment must be imported into the fees analysis by using it to define the factual record on which the fees determi-

nation must be made. Since the plan administrator claimed in his deposition that he acted impartially in determining the amount of past service credit to grant, the Plan argues that the district court was not permitted to find bad faith. There is no precedent for such a position, and we reject it. Indeed, it would be extremely anomalous to find that a plan administrator who is found to have so clearly abused his discretion as to lose at summary judgment is thereby shielded from a finding of bad faith. The facts presented through affidavits and depositions certainly contain evidence of a deliberate attempt to interpret the 1992 Amendment so as to minimize the grant of credits and it was not clear error to find bad faith.

As to *Reinking* factors two, three, and five, the district court found: 1) that the Plan had the ability to pay attorneys' fees because it had assets of more than $11 million and the demonstrated ability to levy additional contributions of close to $1 million as needed,[19] 2) that the award of fees would deter other plans from stonewalling on benefits issues and indeed deter Szymczak from continuing to disfavor other union employees perceived to be loyal to the vanquished former MEBA/NMU leadership in the aftermath of the merger dissolution, *see* Petition for Attorneys' Fees, Ex. 2, Smith Aff. ¶ 3 (describing representation of employees or union officials who were denied medical insurance coverage as part of the political infighting in the MEBA/NMU dissolution), and 3) that the merits of the underlying case had favored Plaintiffs. While the Plan disputes these findings, we find that they were neither unreasonable nor clearly erroneous.

---

**19.** The district court also found that the Plaintiffs had limited financial resources based on modest annual incomes. All three apparently fell into arrears on an agreement to pay litigation expenses on a monthly basis.

As to the question whether Plaintiffs sought to benefit all participants in the Plan or resolve a significant legal question, the district court held in the affirmative, finding that Plaintiffs obtained a ruling below that equitable principles cannot justify a refusal to enforce the terms of a written plan provision. Since this was an issue raised by the Plan as an affirmative defense rather than by Plaintiffs, we are skeptical as to the district court's finding on this factor. However, in ruling on the ultimate issue we must bear in mind that the five factors are only guidelines and none is determinative. Four clearly weighed in favor of awarding attorneys' fees and no factor provided a reason not to do so. Viewing the district court's consideration of the factors *in toto*, we find no abuse of discretion.

▆▆▆▆▆ Turning to Plaintiffs' claims, their argument that the court was required to calculate a reasonable fee rate based on current rather than historical rates does point to an error although it misstates its nature. In *Daly v. Hill*, 790 F.2d 1071, 1081 (4th Cir.1986), this Circuit established that a court must consider the effect of delay in payment (due to lengthy litigation or otherwise) on the calculation of a reasonable fee. The trial court retains discretion to determine the particular method for accounting for the lost time-value of money due to delay in payment. For example, it may apply a fee rate based on an assessment of an attorney's reasonable rate under current market conditions rather than the rates that were appropriate at the time the service was rendered, or alternatively can use historical rates plus some reasonable rate of interest. However, consideration of the effect of

time on the value of the fee is mandatory as part of a consideration of what is reasonably compensatory. *Id.*

The district court did not follow this requirement. It refused to do so because it found that the length of the litigation and consequent delay in the payment of fees to Plaintiffs' attorneys were not attributable principally to the Plan but rather the complexity of the case.[20] It also reasoned that it was necessary to compensate for the lost time-value of money in this case because the rule in *Daly* did not apply to ERISA cases. *Daly* involved a suit for violation of civil rights under 42 U.S.C. § 1983. Unlike plaintiffs bringing suit under civil rights statutes, ERISA plaintiffs are not generally "private attorneys general" seeking primarily injunctive relief that vindicates important public rights. *Thomas v. Peacock*, 39 F.3d 493, 506 (4th Cir.1994), *rev'd on other grounds*, 516 U.S. 349, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996). Relying on this distinction in *Peacock*, the district court concluded it was not required to compensate for delay in this case since incentives in the form of attorneys' fees are less necessary for ERISA plaintiffs than for those raising civil rights claims.

While such considerations may be relevant to the decision to award attorneys' fees or the reasonableness of an hourly rate under the test in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717–719 (5th Cir.1974), they are not apposite to the issue of delay. As this Circuit noted in *Daly*, "delay necessarily erodes the value of a fee that would have been reasonable if paid at the time services were rendered."

---

**20.** The district court also noted that Plaintiffs' attorneys had agreed to a retainer agreement with them that was to provide them with a portion of the fees necessary to prosecute the case. The court did not explain how this was relevant to the issue of delay other than the somewhat mysterious statement that "it was not insignificant that the clients agreed to support the litigation to the extent that they did."

790 F.2d at 1080. Consequently, an award based on historic rates which does not take into account the lost value when a payment is delayed will not be a fully compensatory fee. *Id.* The culpability of the losing party for the delay and the policy reasons for encouraging suits where damage awards may be low and issues of broad public concern are at stake simply do not speak to this fact. We therefore hold that the district court erred in adopting historic rates without considering the effect of delay of payment on the value of the fee.

 Plaintiffs also argue that the district court abused its discretion by failing to grant their request for an enhancement. Grants of an enhancement are both discretionary and rare, and the applicant bears the burden of proof of an exceptional result. *See Blum v. Stenson,* 465 U.S. 886, 897–98, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565–66, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). Plaintiffs base their claim for an enhancement primarily on the degree of their success in obtaining the credits sought and the magnitude of their award. However, the results obtained are initially factored into the lodestar calculation of a reasonable fee and hours expended under the test set out in *Johnson,* and thus are not generally a sufficient basis for an enhancement unless "exceptional." *Blum,* 465 U.S. at 899–900, 104 S.Ct. 1541. Here, though the Plaintiffs argue that the judgment was outside the "heart-land" of usual ERISA cases, they do not provide sufficient evidence for either this claim or the implicit proposition on which it is based that the average ERISA case provides the proper basis for comparison for a case of this nature where a large number of past service credits are at issue.

## VI.

For the foregoing reasons, the district court's finding that the amendment constituted a valid addition to the Plan Document is AFFIRMED. The court's finding that the plan administrator abused his discretion in applying the Amendment is also AFFIRMED and its award of past service credits is REMANDED solely to determine the correct monetary award in light of the requirement of the Plan that lump sums not be paid out until the attainment of 55 years of age. The district court's grant of attorneys' fees is also AFFIRMED in part and REMANDED in part for the district court to determine the correct award in light of the lost time value of the fees due to delay in payment.

AFFIRMED IN PART AND REMANDED IN PART.