Sarah Byers WALLACE, Plaintiff,

v.

METROPOLITAN LIFE INSURANCE
COMPANY and Citigroup, Inc.,
Defendants.

No. CIV 02–4249.

United States District Court,
D. South Dakota,
Southern Division.

Aug. 17, 2004.

John G. Schultz, Woods, Fuller, Shultz & Smith, Sioux Falls, SD, for Defendant Metropolitan Life Ins. Co.

Michael J. Schaffer, Paul H. Linde, Schaffer Law Office, Prof. LLC, Sioux Falls, SD, for Defendant Citigroup, Inc.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

This case involves a claim for long-term disability benefits by the plaintiff, Sarah Byers Wallace ("Wallace"), against defendants, Metropolitan Life Insurance Company ("MetLife") and Citigroup, Inc. ("Citigroup"). Defendants have moved for summary judgment against Wallace. Wallace disputes one of the facts in the Defendants' Statement of Undisputed Material Facts, but Wallace moves for summary judgment in her favor in the event the Court determines that no material factual disputes exist which would preclude summary judgment. For the following reasons, this case will be remanded to MetLife.

## BACKGROUND

With the one exception that is noted herein, the parties agree that the following facts are undisputed. In April 2001, Wallace was employed as a customer service representative for Citigroup and was a qualified participant in the employee welfare benefit plan (the "Plan") sponsored and maintained by Citigroup. MetLife is the Claims Administrator of the Plan and one of the Plan's fiduciaries. Pursuant to the Administrative Services Agreement ("ASA") between MetLife and Citigroup, Citigroup has delegated to MetLife the responsibility and discretionary authority for approving or denying plan benefits in whole or in part.

Clint L. Sargent, Danforth, Meierhenry & Meierhenry, Sioux Falls, SD, for Plaintiff.

Before starting work for Citigroup, Wallace treated with Timothy Donelan, M.D., in January of 2000 for low back spasms. Wallace treated for the first time with Scott Boyens, M.D., for left low back pain on November 29, 2001, at which time Dr. Boyens noted that Wallace had begun lifting free weights two weeks prior and was taking some supplements for body shaping. Dr. Boyens authorized Wallace to return to work at his examination of December 6, 2001. According to Dr. Boyens' exam note of December 19, 2001, Wallace returned to work on December 10 and she was "doing okay there."

Wallace next treated with Robert R. Seidel, M.D., on December 28, 2001. He noted that her lumbosacral back strain was "probably from weight lifting too rapidly and too heavily." Dr. Seidel restricted her to working five hours per day beginning Monday, December 31, 2001. Wallace underwent an MRI on December 27, 2001, which Dr. Seidel read as showing some disk space narrowing and bulge between L4–5 and L5–S1, but no nerve root compression or obvious "disk herniation." .

When Wallace saw Dr. Seidel on January 3, 2002, she complained of increased pain in her low back. Dr. Seidel noted that Wallace "continued to lift some weights. . . . [and] I still feel that her exercise program is aggravating some of this." Dr. Seidel's January 3, 2002, exam note indicates that Wallace made an appointment on her own to see Dr. Alvine on January 21, and that "when I had last seen her I had indicated to her that I felt she could work half days, which would be five hours. She has not gone to work. I specifically asked her not to do any of her exercises. I even reviewed the stretching and asked her not to do that until she is seen by physical therapy and would get the recommendations." Wallace claimed short-term disability ("STD") benefits in December of 2001 for her back condition,

and she received those benefits until she was authorized to return to work on a part-time basis on January 25, 2002.

Wallace first saw orthopedist Greg Alvine, M.D., on February 7, 2002, and reported that her back condition came on when she was shoveling snow in November. Dr. Alvine concluded that the radiological examination of her back was "essentially unremarkable. There may be some mild retrolisthesis of L5–S1." Dr. Alvine reviewed the MRI results from December 27, 2001, noting that Wallace had degenerative disk signals at L4–5 and L5–S1 and that he thought there was a small annular tear on the left at L5–S1 and possibly central at L4–L5. Based upon these findings, he believed that the conditions "should calm down with conservative measures."

Wallace fell down at home and fractured a bone in her right hand on February 7, 2002. On February 8, 2002, Dr. Seidel wrote a note saying Wallace should undertake no work using her right hand "for anything heavy, pulling, gripping" for one week due to the broken bone. Wallace had surgery to repair her hand fracture on February 18, 2002. Wallace's attending physician for her hand injury, orthopedist Robert E. VanDemark, Jr., MD, released her from work beginning February 19, 2002.

When Dr. Alvine saw Wallace for her back on February 28, 2002, he discussed the MRI results with her. He recommended that she stay with the five hour return to work limitations prescribed by Dr. Seidel in December.

Because Wallace did not return to active full-time status for more than 14 calendar days after her initial disability date of December 21, 2001, her original claim was still active when she broke her hand on February 7, 2002. By letter dated March 4, 2002, Met Life informed Wallace that

salary continuance benefits had been approved from December 21, 2001 through March 7, 2002. By letter dated March 11, 2002, Dr. VanDemark released Wallace from work until March 19, 2002. By letter dated March 11, 2002, Met. Life extended Wallace's disability benefits through March 19, 2002. By letter dated April 3, 2002, Dr. VanDemark authorized Wallace off work from March 19, 2002 until April 22, 2002. At the April 22, 2002, examination, Dr. VanDemark prepared a physician's questionnaire and Physical Capacities Evaluation authorizing unlimited sitting, standing and walking, but limiting Wallace's lifting and her use of her right hand until her expected recovery date 2 months later.

At Dr. Alvine's April 29, 2002, examination of Wallace's back, he reported that Wallace could flex to touch her ankles, had good strength, normal sensation and negative sitting straight leg raising. Dr. Alvine recommended that Wallace continue therapy and stay off work for a few weeks. He also asked her to return for another examination in two months in light of her pregnancy. A physician's assistant at Dr. Alvine's office signed a release from work for Wallace for four weeks dated April 29, 2002.

On June 19, 2002, Wallace told Met Life in a telephone conference that her finger was fine, but her back was keeping her out on disability. As a result of a walk-up referral with a nurse consultant, the MetLife claims handler sought updated information from Dr. Alvine and Wallace's physical therapist. On that same day, Met Life received Dr. Alvine's Physical Capacities Evaluation dated June 3, 2002, wherein he described Wallace as having sitting limitations of two hours per day with frequent alteration of positions. Also on June 19, 2002, Met Life received Wallace's personnel profile evaluation wherein Wallace stated that her job as a Customer Service Representative required her to be "confined to a desk;" that she cannot return to work at this time because sitting aggravates her back too much; that she can no longer "run, lift weights, [or do] intense cardio;" that she needs her workstation to be ergonomically correct; that she is able to do laundry and wash dishes and walks 15–20 minutes daily when possible; that bending and twisting is very painful; and that she was not interested in working with someone from Met Life to assist her with returning to work. On July 1, 2002, MetLife's nurse consultant recommended that Wallace's STD benefits be bridged into LTD benefits through June 30, 2002.

At the July 2, 2002, examination by Dr. Alvine, Wallace said that therapy has helped her considerably and Dr. Alvine thought that therapy "seems to be really helping." Dr. Alvine reported good strength in the legs, normal sensation, negative fabere test and no paraspinal muscle spasm. He recommended that Wallace stay off work until she followed up with him 3 months later. Wallace told MetLife on July 8, 2002, that Dr. Alvine wanted her to stay off work while she was pregnant and that her expected due date was in January of 2003. On July 9, 2002, MetLife's nurse consultant recommended inquiry with the employer into Wallace's job description and followup with the physical therapist. By letter dated July 23, 2002, MetLife informed Wallace that under the terms of her disability policy, she met the criteria for long-term disability benefits and that she had been approved through July 31, 2002. MetLife's claims handler spoke with Wallace on July 23, 2002, confirming coverage, but explaining the need for additional information from Wallace's physical therapist to extend benefits. Wallace identified the therapist and her therapy routine.

Wallace's physical therapist, Sue Creel, PT, ATC, filled out a Physical Capacities Evaluation ("PCE") form on July 24, 2002. The parties disagree on what limitations Creel imposed in the PCE. Defendants assert that the PCE indicates Wallace could sit for three hours in an eight hour day, stand for three hours during that same day, and walk for four hours in that same day. Wallace has submitted an Affidavit of Sue Creel indicating that she meant Wallace could either sit for three hours, or stand for three hours, or walk for four hours in an eight hour day, but she could do only one of those activities in an eight hour work day. MetLife did not have the Affidavit of Sue Creel when it was deciding Wallace's claim.

On August 13, 2002, MetLife's nurse consultant recommended that a vocational consultant review the file in light of the physical therapist's PCE. On August 19, 2002, Wallace's supervisor, Mary Jo Masters, told MetLife's vocational consultant that Customer Service Representatives are free to sit, stand and walk as needed, that the workstations could be elevated to allow a Customer Service Representative to type while standing, and that shifts of eight hours per day, as opposed to ten hours per day, were available to Wallace. MetLife's vocational consultant concluded on August 23, 2002, that Wallace could return to full duty. On August 29, 2002, MetLife's claims handler told Wallace that her claim was going to be denied and that a letter would be forthcoming. A denial letter dated August 30, 2002, was issued by Met Life to Wallace stating that no further benefits were due beyond July 31, 2002. The letter referenced MetLife's understanding that Wallace could sit for three hours, stand for three hours and walk for four hours in an eight-hour day. The letter stated, in part:

We have determined that neither the information in our file, or the medical records you provided document function-

al limitations, which would prevent you from performing your job as a Customer Service Representative, which is a sedentary position. There is no objective Physical, or functional reason why you can't return to work, therefore we have made the decision to terminate benefits as of July 31, 2002.

The denial letter advised Wallace of her right to appeal and to submit additional information for MetLife's consideration.

MetLife's file shows that Wallace appealed as of September 9, 2002, with a due date of October 21, 2002. Wallace submitted updated medical information by fax on September 24, 2002, to aid in her appeal. The records consisted of the note from Dr. Alvine dated September 4, 2002, noting the results of the MRI from December of 2001 and stating that "because of ongoing significant back pain, she is unable to return to work", and the letter from Dr. Hassebrock–Johnson dated September 12, 2002, which asserted that Wallace's pain was increasing as the pregnancy progressed and "work is further increasing this pain." Dr. Hassebrock–Johnson recommended that Wallace be off work "for the duration of the pregnancy . . . ." The due date for the appeal decision was identified as November 8, 2002, in the MetLife file as a result of the receipt of the additional medical information from Wallace on September 24, 2002. On October 3, 2002, Wallace contacted MetLife to confirm that the medical information she had mailed was received and she stated that she understood that the appeal process could take up to 45 days.

On October 19, 2002, a report was issued by the independent physician consultant retained by MetLife, Jane T. St. Clair, M.D., who is Board Certified in Occupational Medicine and a Fellow of the American Academy of Disability Evaluating Physicians. While acknowledging "[Wallace's]

pregnancy will cause some physiological changes in her pelvis and spine as the center of gravity shift with the growing fetus." Dr. St. Clair stated that "even with these normal changes that occur during pregnancy, there is no indication that she would harm herself or her baby if she were working during this prepartum period." Dr. St. Clair further noted that the recent PCE from the physical therapist "allows for more than 8 hours a day of sitting, standing and walking" and that "[p]hysical exam findings from all of her physicians have not been remarkable in terms of her loss of functional capabilities." Moreover, "Dr. Alvine's 9/4/02 letter provides no new information" and was "based on the MRI dated 12/27/01, before she was pregnant." Dr. St. Clair commented that Dr. Johnson's letter "provides only subjective information," and remarked "It is too bad that she is not interested in the help that MetLife could offer her. I have seen cases where Claimant's are able to function in sedentary positions with the help of an adjustable workstation and other assistance." By letter dated November 4, 2002, MetLife notified Wallace that the determination to terminate disability benefits was upheld on appellate review.

## DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing defendants' motion, the Court views the evidence presented in the light most favorable to plaintiff, the non-moving party. *Knight v. Cendant Corp.*, 64 F.Supp.2d 902, 904 (D.S.D.1999). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the out-come of the suit in light of the substantive law will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## I. ERISA Standard of Review

■ ERISA itself does not specify the appropriate standard of review for courts reviewing a plan's denial of benefits. 29 U.S.C. § 1132(a)(1)(B). The Supreme Court has held that a reviewing court should apply a *de novo* standard of review unless the plan gives the "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If such discretionary authority is given by the plan, the proper standard of review of the administrator's decision is abuse of discretion. *Id.* In the instant case, the parties do not dispute that the Plan gives MetLife discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Defendants assert that, due to the discretion that MetLife is given under the Plan, its decision to deny Wallace benefits must be reviewed only for an abuse of discretion. Under this deferential standard of review, an administrator's decision will stand if it is reasonable, *i.e.,* if it is supported by substantial evidence. *Farley v. Arkansas Blue Cross and Blue Shield*, 147 F.3d 774, 777 (8th Cir.1998). In other words, a reasonable decision is one which "offers a reasoned explanation, based on the evidence, for a particular outcome." *Donaho v. FMC Corp.*, 74 F.3d 894, 899 (8th Cir.1996). In reviewing an administrator's decision under the deferential standard of review, the Court may consider "only the evidence that was before the administrator when the claim was denied." *Farley*, 147 F.3d at 777. "This deferential standard reflects

[the court's] general hesitancy to interfere with the administration of a benefits plan." *Layes v. Mead Corp.,* 132 F.3d 1246, 1250 (8th Cir.1998).

■■■ Although Wallace does not dispute that the Plan affords MetLife discretionary authority to approve or deny benefits under the Plan, Wallace argues that the Court should review MetLife's decision *de novo.* The Court disagrees. The *de novo* standard applies only if the Plan administrator does not have discretionary authority. *See Firestone,* 489 U.S. at 115, 109 S.Ct. 948 (*de novo* standard applied when ERISA-governed policy does not confer discretionary authority on administrator of plan). The Eighth Circuit has recognized that in certain circumstances courts should apply a sliding scale approach, a less deferential standard of review. *Woo v. Deluxe Corp.,* 144 F.3d 1157, 1161 (8th Cir.1998). Before this is done, the plaintiff must "present material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to her." *Id.* at 1160. The second factor requires a connection between the conflict or procedural irregularity and the substantive decision. *Id.* at 1161. "[I]t requires the courts to apply an abuse of discretion analysis, taking into consideration the conflict or procedural irregularity. The abuse of discretion standard is inherently flexible, which enables reviewing courts to simply adjust for the circumstances." *Id.* Additionally, "[t]he evidence offered by the claimant must give rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." *Tillery v. Hoffman Enclosures, Inc.,* 280 F.3d 1192, 1197 (8th Cir.2002). Assuming some sort of heightened review is appropriate in this case, the standard is not *de novo.*

Wallace asserts that there are three significant procedural irregularities in this case, each of which standing alone would require a heightened level of review. First, Wallace claims that, in an effort to support termination of benefits, MetLife misinterpreted the PCE form completed by Sue Creel. Second, Wallace contends that MetLife violated its claims manual by not directly contacting by telephone Creel and Dr. Alvine in an effort to reconcile the misperceived differing opinions of Creel contained in her PCE and the office notes of Dr. Alvine. Third, Wallace believes MetLife failed to follow its claims manual when it terminated her benefits without first using additional investigative techniques to ensure that its decision was based on substantial evidence.

The Court first will consider Wallace's argument that it was such poor judgment that it amounted to a procedural irregularity for MetLife to conclude that the limitations identified by Creel could be aggregated if they were alternated over an eight-hour day. Wallace points out that there were no markings or comments to indicate that Creel intended each of these activities to be mutually exclusive. On the other hand, there were no markings or comments to suggest that Creel did not think Wallace could work an eight-hour day. Defendants point out that the total number of hours circled was consistent with Wallace's work shift of ten hours per day, four days per week. Even if the Court were to consider the Creel Affidavit, the fact that Creel states therein that both MetLife and its Independent Physician Consultant ("IPC"), Dr. Jane T. St. Clair, misinterpreted the PCE does not render their interpretations unreasonable. There is no evidence that the alleged misinterpretation was intentional. After reviewing the PCE form, the Court finds that it was not a procedural irregularity for MetLife to understand the circled items as repre-

senting Creel's allowance of alternating activities in one work-day, and this does not require application of a heightened standard of review.

The second and third procedural irregularities alleged by Wallace both involve a failure to follow the MetLife claims manual and more thoroughly investigate before denying Wallace's claim. Wallace argues that MetLife's failure to contact Sue Creel or Dr. Alvine after receipt of the PCE form was a procedural irregularity because MetLife's claims manual instructs claims adjusters to contact medical providers to discuss discrepancies in the medical information. She also asserts that MetLife's failure to use additional investigative techniques prior to denying the claim, such as Independent Physician Consultants ("IPC's")[1], Independent Medical Examinations, Functional Capacity Evaluations and Home Visits, all of which are mentioned in the claims manual, amounted to a procedural irregularity.

■ The lack of a thorough investigation by a fiduciary can result in a serious procedural irregularity requiring a less deferential standard. of review. *See Woo*, 144 F.3d at 1161. In *Woo*, Hartford Life's failure to obtain an independent medical review of the plaintiff's benefits claim was found to be a "serious procedural irregularity" and a "serious breach" of the fiduciary duties to use proper judgment and thoroughly investigate a claim. 144 F.3d at 1161. The *Woo* court noted some extenuating circumstances that clearly necessitated an independent medical review: the plaintiff was afflicted with an uncommon disease that, although it had not been properly diagnosed at the time she was eligible for benefits, was subsequently diagnosed by two treating physicians. Under such circumstances, the *Woo* court

held that Hartford Life had a duty to obtain an independent medical evaluation and investigate the treating physicians' diagnoses rather than simply rely on its in-house review of her earlier physicians' treatment notes.

■ The plaintiff has the burden of proving the necessary factors for applying a heightened standard of review. *Woo*, 144 F.3d at 1161. "The need to show a serious breach of fiduciary duty presents a considerable hurdle for plaintiffs." *Phillips–Foster v. UNUM Life Ins. Co. of America*, 302 F.3d 785, 795 (8th Cir.2002). Wallace has failed to meet this rigorous standard. She has not established that procedural irregularities caused a serious breach of the Plan administrator's fiduciary duty. Although it would have been prudent for MetLife to seek clarification from Dr. Alvine about Wallace's ability to return to work and the conditions of her work, the Court finds that failure to do so does not give rise to serious doubts as to whether MetLife's decision was arbitrary or whimsical. This case does not present the same type of extenuating circumstances that existed in *Woo*. Unlike in *Woo*, although Wallace's back pain was aggravated by her pregnancy, the medical diagnoses of Wallace's health problems had not changed and were consistent from the beginning. Moreover, MetLife had the benefit of a PCE from one of Wallace's own medical providers and there is no evidence that MetLife intentionally misinterpreted it. MetLife presented Wallace with several opportunities to present additional evidence. Given MetLife's willingness to accept and consider additional information from Wallace and its decision to have the entire file reviewed by a physician, the Court finds that MetLife's inves-

1. MetLife referred Wallace's case to an IPC after Wallace appealed the decision to termi-    nate benefits.

tigation of this claim was adequate and its decision to deny benefits must be reviewed for a simple abuse of discretion.

## 2. Defendants' Motion to Strike Affidavit of Sue Creel

On September 25, 2003, Wallace filed the Affidavit of Sue Creel which was signed by Creel on May 22, 2003, over six months after MetLife made the final decision to terminate Wallace's benefits on November 4, 2002. MetLife moved to strike the Creel affidavit because neither it nor the information it contains was available for consideration by MetLife when the decision was made to terminate benefits. Wallace opposes the motion to strike, arguing that good cause exists for the Court to consider the affidavit.

In *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641–42 (8th Cir.1997), the Eighth Circuit reversed the district court for impermissibly considering, on deferential review, an affidavit of plaintiff's physician that was unavailable to the plan administrator at the time the coverage decision was made. Then, in *Brown v. Seitz Foods, Inc. Disability Benefit Plan*, 140 F.3d 1198, 1200 (8th Cir.1998), the Eighth Circuit held that "additional evidence gathering is ruled out on deferential review, and discouraged on *de novo* review, to 'ensure expeditious judicial review of ERISA benefit decisions and to deep district courts from becoming substitute plan administrators.'" According to the Eighth Circuit in *Brown*, a court may consider additional evidence on *de novo* review where the plaintiff shows good cause to do so. *Id.* Without explanation, the Eighth Circuit later applied the good cause test in the context of the abuse of discretion standard. *See Ferrari v. Teachers Ins. And Annuity Assoc.*, 278 F.3d 801 (8th Cir.2002). In *Ferrari*, the plaintiff argue[d] that he should have been allowed to submit financial documentation on the grounds that [it] was necessary

and proper evidence that [the administrator] failed to consider or even request when determining his eligibility ... [and] that [the administrator's] failure to perform its duty of informing him of the need to provide th[e] documentation constitute[d] the good cause necessary to supplement the record.

*Id.* at 807. Despite the fact that the benefits determination was not reviewed *de novo*, the Eighth Circuit examined whether the plaintiff had shown good cause to supplement the administrative record. The Eighth Circuit found that there was ample evidence in the record that the administrator had informed the plaintiff the evidence he submitted was inadequate to support an award of benefits. *Id.* Moreover, the plaintiff "offer[ed] no reasonable explanation for his own failure to provide [the administrator] with the information [it] requested." *Id.* In light of the Eighth Circuit's application of the good cause standard to the new evidence offered in *Ferrari* even though the courts were reviewing the benefits determination for abuse of discretion, this Court will consider whether Wallace has shown good cause to admit the Creel affidavit in the instant case.

■ Wallace submits three reasons why good cause exists to consider the Creel affidavit: 1) the evidence is necessary to show a serious procedural irregularity; 2) the evidence is being offered to show that the serious procedural irregularity had a connection to the plan administrator's decision to terminate benefits; and 3) Wallace was misled by MetLife at the time of the termination of her benefits when MetLife stated in its termination letter that the information relied on by MetLife came from Wallace's "Attending Physician" when in fact it came from Creel, the physical therapist, causing Wallace to seek additional information from her two treating physicians rather than from Creel. The first two arguments are rejected because

MetLife did not have the information contained in the Creel affidavit when the benefits decision was made and therefore the information is irrelevant on the issue whether a procedural irregularity occurred. MetLife argues that Wallace's third reason that good cause exists must be rejected because Wallace has never pled it as a basis for relief. MetLife cites no authority for the proposition that a plaintiff is required to plead that good cause exists in order for the Court to consider evidence outside the administrative record.

Wallace's explanation for why she did not seek additional information from Creel for purposes of the appeal is plausible. The August 30, 2002 denial letter states, in part:

> Employees Attending Physician states that in an 8 HR day, the employee can sit for 3 hours, stand for 3 hours, walk for 4 hours, can occasionally lift up to 20 Lbs., can occasionally carry up to 20 Lbs., can do simple grasping, pushing, pulling & fine manipulation with both Hands, can do repetitive motion with both feet, can occasionally bend, squat and reach above shoulder level.

Wallace obtained and submitted additional information from her "attending" physicians, but she did not realize that her physical therapist had provided the information to MetLife regarding her physical capacity to work, so she did not seek any

information from Creel to provide to MetLife on appeal. Wallace has shown good cause for her failure to submit the information from Creel during the proceedings before MetLife, and the Court would consider the Creel affidavit but for the decision to remand this case as discussed below.

### 3. Remand to MetLife

■ Relying on *Wolfe v. J.C. Penney Co., Inc.*, 710 F.2d 388 (7th Cir.1983), the Magistrate Judge recommends that this case be remanded to MetLife to reconsider the PCE form, to consider for the first time the Affidavit of Sue Creel, and to re-evaluate the claim. (Doc. 61.) In *Wolfe*, the plan administrator denied the plaintiff's claim for long-term disability benefits. The Seventh Circuit held that the letter denying benefits did not pass muster under 29 U.S.C. § 1133[2] because it was conclusory, and contained only a blanket request for further "medical information." *Id.*, 710 F.2d at 392–93. The Seventh Circuit characterized the plan administrator's error as procedural in nature. The record in the district court suggested that if the plaintiff had received adequate notice, he would have been able to supplement the record and would have been able to seek full and fair review of his claim. The Seventh Circuit held, therefore, that although the plaintiff was not entitled to a substantive remedy for this procedural violation, he was entitled to a remand[3] to the

---

**2.** Section 1133 provides:

> In accordance with regulations of the Secretary, every employee benefit plan shall—
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appro-

priate named fiduciary of the decision denying the claim.
29 U.S.C. § 1133(1), (2).

**3.** *Wolfe* was decided prior to *Firestone* when the Supreme Court ruled that an ERISA plan administrator's decision should be reviewed *de novo* unless the plan gives the administrator discretionary authority to make benefit determinations. In a case decided after *Wolfe*, the Seventh Circuit explained that, prior to *Firestone*, district courts such as the court in *Wolfe* may have been required to remand the case to the plan administrator if

plan fiduciary for a new determination of his claim. *Id.*, 710 F.2d at 393. Unlike in *Wolfe*, MetLife's denial letter apprised Wallace of the specific reasons her claim was denied and it contained sufficient information about the steps to be taken for obtaining review. In fact, Wallace was able to submit additional information for MetLife's consideration on appeal. However, in the first denial letter dated August 30, 2002, MetLife refers to physical limitations issued by the "Attending Physician" rather than by the physical therapist. Because of this mistake, Wallace did not seek additional information from Creel regarding her physical limitations to submit to MetLife on appeal.

The Eighth Circuit has not addressed the issue whether a district court conducting deferential review of an ERISA plan administrator's benefits determination may direct the administrator to re-open the record and consider evidence that was not available at the time the determination was made, but it has upheld a district court's rejection of new evidence and its refusal to remand the case to the plan administrator on *de novo* review. *See Davidson v. Prudential Insurance Co.*, 953 F.2d 1093 (8th Cir.1992). Davidson challenged the determination that he was not disabled for purposes of the plan's long term disability benefits. *Id.* at 1094. The Eighth Circuit found that Davidson was simply attempting to reopen the record to submit additional, more favorable evidence, developed after litigation had begun, than the evidence he had presented to the plan administrator. *Id.* at 1095. According to the Court, Davidson should have known about this evidence and if he believed consideration of it was necessary to make a correct

determination, he should have presented it to the administrator. *Id.* In light of these facts, the Court rejected Davidson's contention that the district court abused its discretion in refusing either to allow this evidence to be considered or to remand the case to the plan administrator for supplementation of the evidence. *Id.* The Eighth Circuit specifically stated that in these circumstances, it "need not decide whether a district court conducting a *de novo* review of an ERISA plan administrator's benefits determination may consider evidence that was not part of the administrative record, or alternatively, direct the administrator to develop the record further." *Id.*

As discussed above, after *Davidson* the Eighth Circuit ruled that a district court may consider evidence outside the administrative record if the proponent of that evidence shows good cause to do so. This Court believes the Eighth Circuit would also support a remand to MetLife under the circumstances of the present case. Unlike Davidson, Wallace was denied an opportunity to present Creel's opinions to MetLife because MetLife told her the return to work restrictions came from Wallace's attending physicians, so Wallace submitted additional information from the attending physicians and not from Creel, the physical therapist. While MetLife's denial of benefits to Wallace could, arguably, be supported by the present record, the record is incomplete because it does not contain the evidence Wallace may have submitted had MetLife advised her that the physical restrictions relied upon to determine that she could return to work came from her physical therapist rather than her attending physicians. Therefore, whether Wallace was properly denied ben-

---

new facts had to be considered because a deferential standard of review was applied at that time. *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 n. 4 (7th Cir.1994). In *Casey*, the Seventh Circuit held that because *Firestone*

required *de novo* review of an administrator's decision, the district court no longer needed to limit the evidence to that which was before the plan administrator. *Id.*

efits cannot yet be determined. The matter must be remanded to MetLife where Wallace shall be permitted to submit the additional information from Creel that is relevant to her claim. Otherwise, this Court would be acting as a claims administrator by determining what MetLife's decision would have been had it been aware of the information in the Creel affidavit at the time it made the benefits determination. Contrary to Wallace's assertion that this Court should award Wallace benefits, this Court's responsibility is to determine whether MetLife's denial of benefits was arbitrary and capricious, not to determine whether Wallace was, in the Court's view, entitled to disability benefits. Remand under these unique circumstances is consistent with the fact that Congress did not intend federal district courts to function as substitute plan administrators. Accordingly,

IT IS ORDERED:

(1) that defendants' motion to strike is denied (Doc. 42);

(2) that the defendants' for summary judgment is denied (Doc. 43);

(3) that the plaintiff's alternative motion for summary judgment is denied (Doc. 49);

(4) that the Objections to the Report and Recommendation are overruled (Docs. 68, 69, 70);

(5) and that the Court adopts the Magistrate's Report and Recommendation to the extent that this case will be remanded to MetLife (Doc. 61); and

(6) that Wallace's claim for long-term disability benefits is remanded to MetLife to consider the affidavit of Sue Creel and to reconsider the PCE form and the claim generally.