Andria M. **TURNER,** Plaintiff,

v.

The **RETIREMENT AND BENEFIT PLANS COMMITTEE ROBERT BOSCH CORPORATION,** Defendant.

**C.A. No. 2:06–0224–PMD.**

United States District Court, D. South Carolina, Charleston Division.

Oct. 31, 2007.

Anne Bell Fant, Anne Bell Fant Law Office, Rachel North–Coombes, Robert Edward Hoskins, Foster Law Firm, Greenville, SC, for Plaintiff.

Cheryl D. Shoun, Taylor Shoun Bowley and Byrd, Charleston, SC, James Derrick Quattlebaum, Haynsworth Sinkler Boyd, Greenville, SC, Andrew H. Stuart, Ann Hale–Smith, Irvin Standard and Kessler, Atlanta, GA, for Defendant.

### ORDER

PATRICK MICHAEL DUFFY, District Judge.

This matter is before the court for review of The Retirement and Benefit Plans Committee Robert Bosch Corporation's decision to revoke Andria M. Turner's disability benefits under a plan governed by ERISA.[1] The parties filed the Joint Stipulation and memoranda in support of judgment pursuant to the court's Specialized Case Management Order for ERISA benefits cases. For the reasons set forth herein, the court directs entry of judgment in favor of Plaintiff.

### BACKGROUND

Plaintiff was employed as an assembler with Bosch from April 1990 until March 19, 1997. At that time, Plaintiff took a medical leave of absence due to a series of blackouts. Plaintiff was enrolled in the Bosch Braking Systems Corporation Retirement Growth Plan ("the Plan"), which provided that Bosch employees who had been employed for more than five years but were not yet retirement eligible could receive benefits of $350 per month if they suffered a "Total and Permanent Disability."

Plaintiff filed for these benefits. At that time, determination of whether a person was eligible for benefits under the Plan was being handled by UNUM. In meetings with UNUM representatives, Plaintiff informed them that she had suffered from migraine headaches since 1992, and that she also suffered from severe asthma. Plaintiff's personal physician concluded that Plaintiff's migraines, asthma, and blackouts, when considered collectively, rendered her totally disabled and unable to maintain employment. In March 1998, UNUM approved Plaintiff's claim, and she began receiving disability benefits under the Plan.

After being approved for disability benefits, Plaintiff continued to suffer from various medical conditions. In the spring of 1999, Plaintiff underwent a "tilt table test," which showed that the cause of her blackouts had been neurocardiogenic syncope.

---

1. Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461.

This is a circulatory condition in which an insufficient amount of blood is pumped to the brain, resulting in losses of consciousness. In July 2000, Plaintiff had a pacemaker device implanted to remedy her irregular circulation. Plaintiff also was treated for depression and gastroesophageal reflux disease ("GERD") during this time, in addition to continuing to experience migraines and asthma.

Plaintiff also applied for social security disability benefits. On December 7, 1999, the Social Security Administration found that Plaintiff was totally disabled, and awarded her disability benefits retroactive to March 19, 1997 (her last day of work) and on a monthly basis going forward. (AR 265.) In October 2004, Plaintiff's case was reviewed by the Social Security Administration to determine whether her condition had sufficiently improved to terminate her disability benefits. The Hearing Officer determined that her condition had not improved, and she continues to receive social security disability benefits. *Id.* at 82.

In November 2004, MetLife replaced UNUM as the claims administrator for the Plan. In January 2005, MetLife instituted a new plan for the administration of the Plan's claims, including an intention to revisit past determinations of disability. In accordance with this new plan, MetLife contacted Plaintiff, requesting certain medical information and informing her that it intended to contact her treating physicians. On February 8, Plaintiff sent MetLife a four-page fax, which notified them of her social security disability status and giving her a list of all treating physicians and medications. MetLife informed her on February 24 that they desired more substantive information regarding her medical conditions. On March 15, Plaintiff's social security attorney, Ann Bell Fant, faxed MetLife a fourteen page fax consisting of several affidavits (prepared for social security administrative proceedings) from the Plaintiff attesting to the severity of her conditions, an affidavit from one of her physicians stating that Plaintiff would miss at least ten days of work per month due to severe migraines and asthma, and a summary of Plaintiff's recent visits to various physicians. MetLife reviewed this information, and decided to terminate Plaintiff's disability benefits effective March 15, based largely on the lack of any objective test results proving Plaintiff's claims of severe disability. Plaintiff was notified of the decision on March 23, and was informed that she had the right to appeal the decision.

Plaintiff did appeal the decision, and on October 19 submitted a 21–page fax consisting of letters from several of Plaintiff's treating physicians, six office visit notes from physicians, and pulmonary function test results. Based on this information, MetLife sought an independent review of Plaintiff's condition from a cardiologist, a neurologist, and a pulmonologist. Each of these three physicians concluded that Plaintiff was not totally disabled. Based on these opinions, MetLife denied Plaintiff's appeal and found that she should not receive disability benefits under the Plan. MetLife notified Plaintiff of this decision on November 21.

Plaintiff filed a Complaint against MetLife on January 22, 2006. On November 17, Plaintiff filed for, and was granted by the court, leave to amend the Complaint to change the defendant from MetLife to Defendant The Retirement and Benefit Plans Committee Robert Bosch Corporation. On November 20, MetLife was terminated as a party.

Defendant filed an Answer on December 19, which it amended on January 8, 2007. The parties attempted mediation on July 2, but were not successful in resolving their differences. On October 1, both parties

filed a comprehensive joint stipulation with relevant evidence, and both parties filed cross-memoranda in support of judgment on October 1. Each side filed a Reply to the other side's Memorandum in Support of Judgment on October 12.

### ANALYSIS

There are two separate questions before the court in this matter. First, the court must determine whether the appropriate standard of review is *de novo* or abuse of discretion. After making that determination, the court must then apply that standard of review to MetLife's decision to terminate Plaintiff's disability benefits and determine whether Plaintiff's benefits should be reinstated.[2]

### A. Standard of Review

Plaintiff and Defendant dispute the applicable standard of review to be used by the court in reviewing the decision to terminate Plaintiff's disability benefits. Plaintiff asserts that the court should review the decision *de novo*, according no deference to MetLife's decision. Defendant asserts that the correct standard of review is abuse of discretion, which would only allow MetLife's decision to be overturned if the court finds that there is not "substantial evidence" to support that decision.

■ In this case, as in many similar ERISA cases, selecting the standard of review is much more than a mere technicality. The *de novo* standard of review allows the court to examine all of the evidence in the record and decide whether or not the plaintiff in a case is totally disabled without giving any deference to the plan administrator's decision to deny or terminate disability benefits. *See Quesinberry v. Life Ins. Co. of North America,*

987 F.2d 1017, 1025 (4th Cir.1993). Under the abuse of discretion standard, on the other hand, the plan administrator's "decision will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently." *Ellis v. Metropolitan Life Ins. Co.,* 126 F.3d 228, 232 (4th Cir.1997). The plan administrator's decision will be held to be reasonable if it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Brogan v. Holland,* 105 F.3d 158, 161 (4th Cir.1997). Where there are conflicting medical opinions regarding a plaintiff's disability status, courts applying the abuse of discretion standard have generally upheld plan administrators' denial or termination of disability benefits as being sufficiently supported by "substantial evidence." *See, e.g., Elliott v. Sara Lee Corp.,* 190 F.3d 601, 606 (4th Cir.1999); *Brogan,* 105 F.3d at 162–63.

■ ERISA itself does not specify the standard of review that should be used by courts when reviewing denials of disability benefits. The Supreme Court, applying principles of trust law, held that the determining factor in which standard of review applies is whether the decisionmaker had reserved the discretionary power to make such a decision. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). *See also Feder v. Paul Revere Life Ins. Co.,* 228 F.3d 518, 522 (4th Cir.2000) ("It is well established that a court reviewing the denial of disability benefits under ERISA initially must decide whether a benefit plan's language grants the administrator or fiduciary discretion to determine the claimant's eligibility for benefits, and if so, whether the administrator acted within the

---

**2.** A number of other potentially contentious issues have been stipulated to by the parties. The parties agree that these matters are subject to ERISA, are governed by "the Plan," and that Plaintiff properly exhausted all administrative remedies.

scope of that discretion."). "If a plan does not clearly grant discretion, the standard of review is de novo." *Gallagher v. Reliance Standard Life Ins. Co.,* 305 F.3d 264 (4th Cir.2002). If the plan does explicitly grant discretion to an administrator or fiduciary, the appropriate standard of review is abuse of discretion. *See Johannssen v. District No. 1- Pacific Coast District,* 292 F.3d 159, 168 (4th Cir.2002). The key matter for the court to decide, therefore, is whether, consistent with the terms of the Plan, Defendant delegated to MetLife the ability to terminate Plaintiff's disability benefits.

 The Plan provides, in relevant part: [3]

The Plan Administrator shall have the exclusive right to make any finding of fact necessary or appropriate for any purpose under the Plan including, but not limited to, the determination of the eligibility for and the amount of any benefit payable under the Plan.... The Plan Administrator shall have the full discretionary authority and power to control and manage all aspects of the Plan, to determine eligibility for Plan benefits, to interpret and construe the terms and provisions of the Plan, to determine questions of fact and law, to direct disbursements, and to adopt rules for the administration of the Plan as it may deem appropriate in accordance with the terms of the Plan and all applicable laws. *The Plan Administrator may allocate or delegate its responsibilities for the administration of the Plan to others under the Plan, including discretionary authority to interpret and construe terms of the Plan, to direct disbursements, and to determine eligibility for Plan benefits.*

(AR 1032) (emphasis added). It is clear to the court that the Plan gives Defendant the ability to delegate the responsibility of determining whether someone is eligible for disability benefits or not. ERISA provides that "[t]he instrument under which a plan is maintained may expressly provide for procedures for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan." 29 U.S.C. § 1105(c)(1)(B).

The agreement between Defendant and MetLife is entitled "Disability Benefit Plan Advice–to–Pay Administrative Services Agreement" (hereinafter "ASA"). (AR 1053.) The ASA refers to Defendant as "Customer." *Id.* at 1057. The ASA provides:

**Initial Claim Evaluation.** Through contact with appropriate parties, MetLife will conduct an initial evaluation of Claims to determine whether disability benefits are payable. When deemed appropriate by MetLife, the initial Claim evaluation will include review by medical professionals including but not limited to disability nurse specialists employed by MetLife. Customer and MetLife agree that pursuant to the Agreement, MetLife has been granted discretion to construe Plan terms necessary to make such determinations. MetLife will verify medical information with the Participant's medical professional prior to making the Claim determination or initiating Plan Benefit payments, when such verification is deemed necessary by MetLife.

*Id.* at 1058. The ASA clearly delegates to MetLife the responsibility for conducting initial evaluations of claims and determining their validity. Plaintiff does not dis-

---

**3.** The Plan explicitly defines "Plan Administrator" as "company." (AR 0997.) It then defines "company" as "Bosch Braking Sys-

tems." (AR 0989.) So Defendant is the "Plan Administrator."

pute this. However, the ASA goes on to state, under the section heading "Final Authority and Funding for the Plan," "[e]xcept as otherwise provided in this Agreement, Customer retains all final authority and responsibility for the Plan and its operation and for compliance with any and all applicable laws relating thereto." *Id.* at 1061. Finally, the ASA also provides:

> **Review of Adverse Claim Determination:** Customer and MetLife acknowledge that pursuant to this Agreement, Customer will conduct a review of any Claim denied or terminated in whole or in part upon receipt of an appeal by a Participant. Customer will determine whether the initial Claim determination should be upheld, overturned or modified. *Customer has retained the responsibility and discretionary authority for providing the full and fair review of determinations concerning eligibility for Plan Benefits and the interpretation of Plan terms in connection with the appeal of Claims denied in whole or in part, required under ERISA Section 503 and, therefore, Customer is the Named ERISA Claims Review Fiduciary.* Any determination or interpretation made by Customer shall be given full force and effect and be binding on the Participant and MetLife.
>
> a. Customer will provide notice to Participants of the availability of the Claim review procedure.
> b. MetLife will provide Customer with all information and documents within its control needed to facilitate the review of a Claim on appeal.
> c. Customer will inform MetLife and Participant of its determination on appeal in accordance with its Claim notification process.

*Id.* at 1062 (emphasis added).

Plaintiff asserts first that the *de novo* standard of review is appropriate because

the Plan instrument itself never explicitly grants any discretion to MetLife. (Pl.'s Mem. in Support of J. at 25.) This is a misunderstanding of the law, and the case Plaintiff relies upon in making this argument, *Fowler v. Life Ins. Co. Of North America,* C/A No.: 6:00–1127–HMH (D.S.C.2000), does not stand for the asserted proposition. In *Fowler,* Judge Herlong applied the *de novo* standard of review to a decision made by a third party administrator of an ERISA benefits plan because the plan instrument did not explicitly delegate discretion to the third party. However, that case is materially distinguishable from this one because the plan instrument did not reserve to the plan provider the ability to delegate discretion to any such third party. Where a plan instrument reserves to the plan provider the ability to delegate discretion to a third party administrator, any decisions made by the administrator within the scope of properly delegated discretion is subject to the abuse of discretion standard of review. *See Geddes v. United Staffing Alliance Employee Medical Plan,* 469 F.3d 919, 924 (10th Cir.2006) (applying abuse of discretion to decision made by third party administrator where original plan document merely provided that "[t]he Company will engage an independent claims administrator to administer the Plan . . .")

Plaintiff also asserts that it is clear from the ASA that the power and responsibility for reviewing initial adverse determinations lies solely with Defendant, not MetLife. The record indicates, and neither party denies, that MetLife, not the Defendant, conducted the review of the Plaintiff's initial adverse determination. Plaintiff was notified that her appeal had been denied on a letter printed on MetLife letterhead and signed by a Procedure Analyst from MetLife Disability. (Pl.'s Mem. in Support of J. at 17–19.) MetLife also sent a letter to Defendant explaining that

Plaintiff's appeal had been denied, but explaining to Defendant that MetLife could not disclose any more "confidential" information. *Id.* at 16. Defendant does not claim, and no evidence in the record indicates, that Defendant played any role whatsoever in reviewing Plaintiff's appeal of the initial adverse determination. For this reason, Plaintiff claims that the court should use a *de novo* standard of review, since MetLife was never given discretion to review its own initial adverse determination.

The court agrees with Plaintiff's assertion that the ASA does not delegate to MetLife the power to review initial adverse determinations. In fact, the ASA explicitly does not delegate this, and states in no uncertain terms that Bosch retains that power, when it says, "Customer will conduct a review of any Claim denied or terminated in whole or in part upon receipt of an appeal by a Participant. Customer will determine whether the initial Claim determination should be upheld, overturned or modified." (AR 1062.)

However, there can also be no doubt that the Plan instrument itself explicitly gives Defendant the right to delegate its discretionary powers to another party. By enacting the ASA with MetLife, it did confer some of its discretion. But it did not confer all of its discretionary power, specifically the ultimate responsibility for reviewing adverse determinations. By exercising this very power, then, MetLife was exercising discretion which had never been delegated to it by Defendant. The question, therefore, is whether ERISA only requires that the original instrument itself reserve the power to delegate, or whether it also requires such delegation to be explicit and proper in any subcontract agreements with third parties. In other words, is it enough for Defendant to reserve *the right* to delegate its discretionary powers, or must it actually explicitly delegate these powers to a third party?

The court is not limited to the Plan document itself in determining whether such a delegation took place. *See, e.g., Cagle v. Bruner,* 112 F.3d 1510, 1517 (11th Cir.1997) (per curiam) (examining "plan documents" in determining whether or not discretionary authority had been delegated); *Block v. Pitney Bowes, Inc.,* 952 F.2d 1450, 1453–54 (D.C.Cir.1992) (same). Administrative Service Agreements similar to the ASA in question here are often considered by courts in determining whether discretion was delegated. *See, e.g., Semien v. Life Ins. Co. Of N. Am.,* 436 F.3d 805, 810 (7th Cir.2006) (considering ASA in determining whether or not discretion had been delegated); *Reich v. Lancaster,* 55 F.3d 1034, 1047 (5th Cir.1995) (same); *Abnathya v. Hoffmann–La Roche, Inc.,* 2 F.3d 40, 42 (3d Cir.1993) (same); *Kinser v. Plans Administration Committee of Citigroup, Inc.,* 488 F.Supp.2d 1369, 1378 (M.D.Ga.2007) (same); *Luck v. Metropolitan Life Ins. Co.,* 2006 WL 2582939 *6–7 (C.D.Cal. Aug. 29, 2006) (same); *Campbell v. Chevron Phillips Chem. Co.,* 2006 WL 2380896 *11–*12 (E.D.Tex. Aug.15, 2006) (same); *Costantino v. Washington Post Multi–Option Benefits Plan,* 404 F.Supp.2d 31, 39–41 (D.D.C.2005) (same); *Wallace v. Metropolitan Life Ins. Co.,* 332 F.Supp.2d 1280, 1286–87 (D.S.D.2004) (same).

"To be an effective delegation of discretionary authority so that the deferential standard of review will apply, ... the fiduciary must *properly* designate a delegate for the fiduciary's discretionary authority." *Rodriguez–Abreu v. Chase Manhattan Bank,* 986 F.2d 580, 584 (1st Cir.1993) (citing *Madden v. ITT Long Term Disability Plan,* 914 F.2d 1279, 1283–84 (9th Cir. 1990)). "[W]e require 'explicit discretion-granting language' in the policy or in other

plan documents to trigger the ERISA deferential standard of review." *McKeehan v. Cigna Life Ins. Co.*, 344 F.3d 789, 793 (8th Cir.2003) (citation omitted). *Cf. Bynum v. Cigna Healthcare of North Carolina, Inc.*, 287 F.3d 305, 313–14 (4th Cir. 2002) (holding that when construing plans under ERISA, ambiguities are "construed against the drafter of the plan, and it is construed in accordance with the reasonable expectations of the insured.").

While the court is aware of no courts that have addressed this precise issue, the method in which courts have addressed analogous issues is instructive. In the *McKeehan* case, for example, a plan provider had explicitly reserved the right and ability to delegate its discretionary powers to third parties. It initially did so to a third party administrator. 344 F.3d at 792. However, before a final decision was reached on the plaintiff's claim, the provider underwent a change in ownership, and decided to change third party administrators. *Id.* The plaintiff's claim for benefits was eventually denied by the new third party administrator. *Id.* However, the provider and the new third party administrator could produce no agreement between them that delegated the provider's discretionary powers. *Id.* at 793. Since there was no evidence of any such delegation ever having formally taken place, the Eighth Circuit concluded that the new third party administrator had never validly received any discretionary powers from the administrator, and therefore reviewed the denial of benefits under a *de novo* standard of review. *Id.* ("LINA failed to present evidence that its contractual agreement with the current Plan sponsor included the grant of such discretion.")

The First Circuit heard a similar case in *Rodriguez–Abreu v. Chase Manhattan Bank.* 986 F.2d 580 (1st Cir.1993). In that case, the plan document had reserved to the plan provider the right to delegate its discretionary powers to a third party administrator. *Id.* at 584. However, the defendant could not produce any evidence that any discretion was ever explicitly delegated to the third party administrator. *Id.* ("Chase relies on inferences from the circumstances to establish that Smith was the delegate of the Fiduciaries, which we find insufficient to prove delegation of discretionary authority ...."). Ultimately, the court concluded that "[b]ecause the relevant plan documents did not grant discretionary authority to the Plan Administrator and the Named Fiduciaries did not expressly delegate their discretionary authority to the Plan Administrator, we find that the district court correctly employed the *de novo* standard of review." *Id.*

On the other hand, when ASAs have constituted complete grants of discretionary authority, and the third party administrators make final determinations of benefits claims, courts have applied the abuse of discretion standard. *See, e.g., Kinser*, 488 F.Supp.2d at 1377–79.

When dealing with the apparently unusual situation of a third party administrator who overstepped a partial delegation of discretionary authority, the court holds that the most basic and essential principles of contract and trust law dictate the application of a *de novo* standard of review. Simply put, the court cannot apply an abuse of discretion standard of review to a decision made by a decisionmaker who never had the discretion to make that decision. The "Review of Adverse Claim Determination" Section of the ASA could not be more explicit in its reservation to Defendant of the power and responsibility for reviewing adverse claim determinations. When examining the original Plan document and the ASA, "the reasonable expectations of the insured" would surely be that while MetLife may make the initial determination on benefits claims, an ap-

peal from this adverse initial determination would have to be considered and handled by Defendant. *Bynum*, 287 F.3d at 313–14.

Accordingly, the court finds that the discretionary authority to review initial adverse determinations on benefits claims was never delegated to MetLife, and thus the appropriate standard of review for MetLife's decision to terminate Plaintiff's disability benefits is *de novo*.

## B. MetLife's Termination of Plaintiff's Disability Benefits

The court now turns to the issue of whether MetLife's decision to terminate Plaintiff's disability benefits was proper. Under the *de novo* standard of review, the court examines all of the evidence in the record, and based on this evidence, determines if Plaintiff is disabled under the terms of the Plan. Under the Plan, "[a] Total and Permanent Disability means a disability such that the Participant is prevented from engaging in gainful employment for wage or profit, which disability is expected to be permanent."[4] (AR 1008.) The task before the court, therefore, is whether the record indicates that Plaintiff is permanently disabled such that she is unable to work.

MetLife based its decision mainly upon the independent analysis it solicited from the neurologist, cardiologist, and the pulmonologist. All three specialists examined Plaintiff's record and determined that, with regard to their field of expertise, Plaintiff was not totally disabled.[5] The record does not indicate, and Plaintiff has not claimed, that she has experienced any incidents of further blackouts since her pacemaker was installed in 2000. These losses of consciousness resulting from her neurocardiogenic syncope were the primary reason she had to cease work. While Defendant does not dispute that Plaintiff suffers from migraines and asthma, they point out that Defendant began to experience symptoms from both prior to March 19, 1997, when she ceased working for Bosch. Given that these remaining symptoms did not previously prevent her from working, and the medical condition that did force her to leave her job at Bosch has been resolved, they claim that Defendant is no longer totally disabled under the Plan. (Def.'s Mem. in Support of J. at 11–14.)

4. Plaintiff points out that in its initial decision to terminate Plaintiff's disability benefits, MetLife misstated the Plan's definition of total disability. It appears that MetLife was using the standard articulated in a different plan it was responsible for administering. The test for disability, as MetLife stated it, was if one was "unable to perform the duties of any gainful occupation for which they are reasonably qualified taking into account their training, education, and experience." (AR 17.) However, there is no indication from anywhere in the record or in the pleadings of either party that this misstatement of the standard in any way impacted MetLife's decision. The primary difference in the two definitions is the incorrect definition's consideration of the person's "training, education, and experience." However, there is no indication that any of these factors was taken into account by MetLife. The record indicates that MetLife restricted its inquiry into Plaintiff's medical conditions, and whether she would be able to pursue any kind of employment. Accordingly, the court finds that the misstatement of the definition of total disability is ultimately not relevant to the resolution of this matter.

5. Leonard Sonne, a pulmonologist, restricted his analysis to whether Plaintiff has a "decreased exercise tolerance" or "a respiratory limitation to perform exercise." (AR 28.) Joseph J. Jares, III, a neurologist, concluded that *"[f]rom a neurological perspective, Ms. Turner retains the ability to work anywhere from a sedentary to medium level of occupation without limitation." Id.* at 34 (emphasis added). Michael J. Rosenberg, a cardiologist, concluded that "[t]here should be no limitation, *from a cardiovascular perspective*, of Ms. Turner's functional ability." *Id.* at 41 (emphasis added).

### 1. Plaintiff's Depression as a Contributing Factor to Her Disability

■ Plaintiff asserts that Defendant erred in not considering her depression as a contributing factor in her asserted disability. (Pl.'s Mem. in Support of J. at 16.) Severe depression can render someone unable to work such that they should receive disability benefits. *See, e.g., Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 511–512 (6th Cir.2005). It does not appear from anywhere in the record that MetLife considered Plaintiff's depression when making the final decision to terminate her disability benefits. MetLife did not seek the consultation of a psychiatrist or psychologist before making its decision. According to a report by the Plaintiff's psychiatrist, "[h]er Beck Depression Score of 54 places her in the severe range ... Andria sees herself as worthless, with low energy, difficulty making decisions, and sees her future as hopeless. Frequently, she feels she is being punished, and this may fit with her strict religious background." (AR 402.) Her psychiatrist also reported:

> [T]here is little doubt that she suffers from a severe, sometimes debilitating depression, without psychotic features. She finds few sources of pleasure in her life. She is caught in a push-pull feeling her need for dependence on others, yet wishing to maintain her isolation from them. She would be a good candidate for individual counseling. Maintenance of stable productivity in a work setting would be very difficult for her, and she would likely be problematic to supervisors and co-workers, due to the emotional lability [sic].

(AR 404.)

However, these reports were written in May 1999. Plaintiff has not produced any recent test results or medical expert opinions that her depression continues to have a disabling effect.[6] The record clearly shows that Plaintiff had to stop working mainly because of her neurocardiogenic syncope, and that she continues to suffer from this condition as well as debilitating migraine headaches and asthma. There is no indication that Plaintiff's depression was a factor in her being forced to stop working in March 1997, and Plaintiff has not produced substantiating evidence for her claim that depression is an important contributing factor to her current claimed disability. Accordingly, the court holds that it was not error for MetLife not to seek a consult from a mental health specialist in the course of its inquiry into Plaintiff's disability status.

### 2. The Cumulative Effect of All of Plaintiff's Conditions

■ Plaintiff also claims that MetLife erred by not considering her multiple medical conditions in conjunction with one another. Plaintiff argues that it is clear from the reports of the three specialists consulted by MetLife that each specialist was only considering the one specific condition in his field of expertise: the cardiologist's report only recommended that Plaintiff's neurocardiogenic syncope, on its own, did not render her totally disabled; the neurologist's report only recommended that Plaintiff's migraines, on their own, did not render her totally disabled; and the pul-

---

**6.** From all appearances, Plaintiff certainly does suffer from depression. At least as recently as August 2003, Plaintiff was prescribed the antidepressant Paxil to treat her symptoms. (AR 85.) However, a mere showing of depression is insufficient here, as Plaintiff has not shown that she suffers from such severe depression that would it make her unable to work.

monologist's report only recommended that Plaintiff's asthma, on its own, did not render her totally disabled. (Pl.'s Mem. in Support of J. at 29.)

Defendant disagrees with this assertion, and claims that "it is clear from the reports from the independent experts in cardiology, pulmonology, and neurology that each one of them was aware of and took into consideration all of Plaintiff's past and present conditions, not just the one in which he had the particular expertise." (Def.'s Mem. in Support of J. at 16.) Defendant also points out that medical specialists are inherently limited in the scope of their review, as there are few if any physicians with expertise in cardiology, neurology, and pulmonology. (Def.'s Reply Mem. at 5.)

It is quite well-established that when presented with a disability claim by an insured who suffers from multiple ailments, a plan administrator may not simply evaluate each condition independently to determine whether any single condition is sufficiently disabling. Rather, ERISA requires the administrator to evaluate the possibly disabling effect of all medical conditions taken together. *See, e.g., Layton v. Heckler,* 726 F.2d 440, 442 (8th Cir.1984) ("Each illness standing alone, measured in the abstract, may not be disabling. But disability claimants are not to be evaluated as having several hypothetical and isolated illnesses. These claimants are real people and entitled to have their disability measured in terms of total psychological well being."); *Torgeson v. Unum Life Ins. Co. of America,* 466 F.Supp.2d 1096, 1134 (N.D.Iowa 2006) (finding that it was an abuse of discretion for insurance company not to consider the "combined effect" of all of insured's ailments where "none of the questions posed for the medical reviewers asked or required them to consider the comorbid effects of any combination of conditions."); *Nickola v. Group Life Assur. Co.,*

2005 WL 1910905 *9 (N.D.Ill.2005) ("[E]ven if one single impairment might not be debilitating, the combined force of multiple impairments might be, and that subject merits a reasoned assessment."); *Austin v. Continental Cas. Co.,* 216 F.Supp.2d 550, 558 (W.D.N.C.2002) ("It is consideration of the full panoply of ailments and their combined impact on capacity for work that is important ..."); *Buffaloe v. Reliance Standard Life Ins. Co.,* 2000 WL 33951195 *8 (E.D.N.C.2000) ("[E]ven if these conditions standing alone would not justify a finding of total disability, an administrator cannot be permitted to ignore the effect of suffering from these conditions simultaneously, as defendant has apparently done in this case.").

The court is at a loss to understand Defendant's assertions that it is "clear" from the statements of the specialists retained by MetLife to evaluate Plaintiff's disability claim that each specialist was evaluating all of Plaintiff's conditions. (Def.'s Mem. in Support of J. at 16) ("Moreover, it is clear from the reports from the independent experts in cardiology, pulmonology, and neurology that each one of them was aware of and took into consideration all of Plaintiff's past and present conditions, not just the one in which he had the particular expertise."). This claim is somewhat dubious. The pulmonologist, Dr. Sonne, evaluated Plaintiff's disability under a section entitled "Pulmonology Assessment," which, with the exception of a brief mention that Plaintiff had been diagnosed with neurocardiogenic syncope, was exclusively concerned with Plaintiff's asthma. (AR 26–29.) The neurologist, Dr. Jares, mentions Plaintiff's asthma only in passing, and under a section entitled "Neurology Assessment," focused on Plaintiff's neurocardiogenic syncope and migraines. (AR 32–35.) The cardiologist, Michael Rosenberg, under a section entitled "Cardiology Assessment,"

restricted his analysis to Plaintiff's neurocardiogenic syncope.[7] (AR 38–41.) The fact that these specialists may have mentioned conditions outside of their respective field expertise does not, as Defendant would have the court believe, amount to a consideration and analysis of such conditions. On the contrary, a review of these physicians' statements shows that their substantive analysis was limited to Plaintiff's condition(s) in their respective field of expertise.

However, the court is also receptive to Defendant's assertion that doctors with specialties in all of neurology, cardiology, and pulmonology are few and far between, and that it would be impractical and unfair to expect insurance companies to locate such a learned and accomplished individual. The court also recognizes that to require neurologists to render their "expert" opinions on matters of cardiology, and vice versa, would only serve to obfuscate, not reveal, the truth regarding whether or not an insured was, in fact, disabled. The law, then, does not require the physicians themselves to consider all of an insured's conditions if they are not qualified to do so, as long as the ultimate decision maker synthesizes the opinions of the medical experts and considers the cumulative effect before denying or terminating disability benefits.

Here, however, there is no evidence, aside from Defendant's own conclusory statements on the subject, that MetLife did any such thing. In the letter sent to Plaintiff on November 21, 2005, notifying her that her initial adverse ruling had been upheld, there is a four paragraph explanation of how MetLife came to the decision that Plaintiff was not, in fact, totally disabled. (AR 17–19.) The first of these paragraphs begins "From the pulmonary perspective ..." and goes on to explain that Plaintiff's asthma is not sufficiently debilitating to prevent her from pursuing gainful employment. *Id.* at 18. The second of these paragraphs begins "Ms. Turner, from a neurological perspective ..." and goes on to explain that Plaintiff's neurocardiogenic syncope was not sufficiently debilitating to prevent her from pursuing gainful employment.[8] *Id.* The third of these paragraphs begins "From a cardiologist perspective ..." and goes on to explain that Plaintiff's neurocardiogenic syncope was not sufficiently debilitating to prevent her from pursuing gainful employment. *Id.* The final of these paragraphs reads:

> In completing our appeal review, we have determined that although Ms. Turner had *conditions* that required medical care and treatment, she did not meet the definition of disability. The medical documentation did not support the presence of *a severe disorder* that would prevent functioning at her medium labor occupation as a Master Vac Assembler. Ms. Turner had the ability to perform at medium labor activities. We continue to lack evidence of *a severe impairment* that would have prevented Ms. Harper from performing her own sedentary occupation beyond March 20, 2005. Therefore, we find our original decision was appropriate.

*Id.* (emphasis added). The court holds that it is much more than a mere grammatical coincidence that MetLife acknowledged that Plaintiff had plural "conditions," but when stating the shortcomings

---

7. Furthermore, Rosenborg even explicitly acknowledged that "Turner may have limitations from obesity, asthma, and anxiety/depression." (AR 41.)

8. The neurological paragraph made no mention of Plaintiff's migraines, regarding which she had shown substantial documentation, and regarding which the neurologist Dr. Jares had performed analysis for the Defendant.

of Plaintiff's disability claim, used the singular, saying that Plaintiff had not demonstrated that she suffered from "a severe disorder" or "a severe impairment." Given that Defendant cannot point to any evidence to the contrary, the record suggests that MetLife's determination that Plaintiff was not disabled was based on the determination that each of her conditions, viewed individually, was not sufficiently debilitating to prevent her from working.

Accordingly, the court finds that MetLife erroneously failed to consider the cumulative impact of Plaintiff's medical conditions.

### 3. Prior Adjudications of Plaintiff's Disability

■ Also of some relevance to this inquiry is that the Social Security Administration judged Plaintiff to be totally disabled, and awarded her disability benefits in 1999. In 2004, the Social Security Administration reevaluated Plaintiff's disability status, ultimately determining that she was still totally disabled, and Plaintiff continues to receive social security disability benefits. While such a determination is certainly not binding, it is well-established in the Fourth Circuit that the SSA's determination of someone's disability status is evidence that can be considered by a court ruling on the denial or termination of disability benefits. *See, e.g., Elliott,* 190 F.3d at 607; *Brogan,* 105 F.3d at 163; *Boyd v. Trustees of the United Mine Workers Health & Retirement Funds,* 873 F.2d 57, 58–59 (4th Cir.1989). The Social Security Administration defines "disability" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a) (1999). While this is certainly not identical to the definition of disability articulated in the

Plan, "the inability to do any substantial gainful activity" is sufficiently similar that the court does at least consider this as a factor, albeit far from a determining one. *See also Paese v. Hartford Life and Accident Ins. Co.,* 449 F.3d 435, 442 (2d Cir. 2006) ("The court acted well within its discretion when it considered the SSA's findings as some evidence of total disability, even though they were not binding on the ERISA Plan, and even though the SSA's definition of disability may differ from that in the [ ] Plan."); *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 294 (6th Cir.2005) ("[T]he SSA determination, though certainly not binding, is far from meaningless.").

Courts have also determined that if a plaintiff has previously been judged to be totally disabled such that they received disability benefits, and those benefits are subsequently revoked, there is a heavier burden on the defendant for showing that the plaintiff has become able to pursue gainful employment in the interim between decisions. *See, e.g., Houston v. Unum Life Ins. Co. of America,* 2007 WL 2171254 *10 (6th Cir.2007) ("Here, because (1) Unum previously determined that Houston was entitled to continued long-term benefits due to breast cancer-related edema in her right arm, and (2) Houston presented objective evidence of ongoing disability in the form of restrictions prescribed by her doctors and a vocational analysis performed by a licensed counselor, we conclude that Houston remains presumptively entitled to continuation of her previously awarded long-term disability benefits."); *McOsker v. Paul Revere Life Ins. Co.,* 279 F.3d 586, 589 (8th Cir.2002) ("[T]he previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments.").

Plaintiff was initially judged to be disabled by UNUM in March 1998. In December 1999, the Social Security Administration judged Plaintiff to be completely disabled and unable to work, and began paying her disability benefits. In October 2004, the Social Security Administration reevaluated Plaintiff's disability status, and judged that she was still totally disabled such that she should continue to receive disability benefits. The court considers these prior determinations of Plaintiff's disability under substantially similar definitions of "disability" as the Plan's as relevant to this inquiry.

### 4. The Weight of the Evidence

■ As discussed above, MetLife based its decision to terminate Plaintiff's disability benefits on the written reports issued by the three medical experts. The reports of Dr. Jares, the neurologist, and Dr. Rosenberg, the cardiologist, were based solely on Plaintiff's medical records. (AR 32–35, 37–41.) The report of Dr. Sonne, the pulmonologist, was based on the records and on one phone call with Dr. White, one of Plaintiff's treating physicians. Id. at 26–29. None of the three has ever seen Plaintiff to treat, diagnose, or evaluate any of her medical conditions. Aside from the conversation between Dr. Sonne and Dr. White, none of the three specialists hired by MetLife to review Plaintiff's claims has ever spoken to any physician who has seen Plaintiff in person. Ultimately, MetLife concluded that since Plaintiff had suffered no further episodes of her neurocardiogenic syncope since having the pacemaker implanted, and since Plaintiff had worked for Bosch with asthma and migraines prior to leaving her position and receiving disability benefits, Plaintiff was able to work and should no longer receive disability benefits under the Plan. (Def.'s Mem. in Support of J. at 16) ("Plaintiff has simply failed to demonstrate that, now that her syncope is under control, her overall condition is significantly different from or significantly worse than it was when she was working full time for Bosch.").

The Plaintiff's treating physicians have a markedly different outlook on Plaintiff's occupational abilities than the three experts hired by MetLife. Doctor Clayton R. Lowder, III, Plaintiff's general physician who has treated her for a number of years, claims that Plaintiff's asthma and migraines would mean that she "would miss at a minimum 10 days of work per month." (AR 80.) Lowder also reports that Plaintiff continues to require steroids and antibiotics for her asthma, and frequently must use a nebulizer, a breathing machine which delivers medicine in mist form through a tube. Id. at 79. Doctor Charles H. White, Plaintiff's treating pulmonologist, states unequivocally that "[i]t is my medical opinion that the disability evaluation was flawed and the determination to stop her benefits is medically unsupported and can be a potential medical disaster to Mrs. Turner ..." Id. at 54. White writes that Plaintiff's severe asthma symptoms are exacerbated by "environmental stimulants" such as smoke, animals, dust, chemicals, cleaning products, and other materials Plaintiff would likely come into contact in any workplace. Id. at 53. White believes that the only way for Plaintiff to minimize exposure to these conditions is by "staying home most of the time." Id. Furthermore, White points out that Plaintiff's gastroesophageal reflux and gastroparesis severely restrict the treatment options for Plaintiff's asthma, since they inhibit her ability to take certain types of medication. Id. at 52. White goes on to say that, contrary to MetLife's assumption that since Plaintiff previously worked while suffering from asthma symptoms she can now do so again, Plaintiff's asthma has gotten significantly worse in recent years:

Since that prior letter [written in February 2003], the degree of severe asthma

and related changes to the lungs has progressed as is often seen in patients with severe asthma. Mrs. Turner's airways have undergone "remodeling" due to the persistent long term inflammation of the airways and resultant wheezing. It is my opinion that Mrs. Turner's pulmonary condition has progressed to chronic obstructive pulmonary disease (COPD).

*Id.*

As an initial matter, the court makes clear that MetLife was not subject to the "treating physician rule" that applies to Social Security disability proceedings. The Supreme Court, in *Black & Decker Disability Plan v. Nord,* held that in ERISA cases, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). It was certainly not erroneous, therefore, for MetLife to refuse to give more weight to the opinions of Plaintiff's treating physicians than the three physicians it hired to review the file.

However, the undeniably conspicuous fact is that, according to the record, the physicians who have treated the Plaintiff conclude that she is totally disabled and unable to pursue gainful employment. The only physicians who have concluded that Plaintiff is in fact not disabled and able to work are the three doctors hired by MetLife, who based their assessment on the Plaintiff's medical records. The court certainly has no medical expertise, and in no way questions the competency or objectivity of the physicians retained by MetLife, but it is simple common sense that there is information that a doctor may receive from hands-on treatment and interpersonal interaction with a patient that simply cannot be transmitted on a piece of paper. This proposition is amply supported by case law. *See, e.g., Oliver v. Coca Cola Co.,* 497 F.3d 1181, 1196–97 (11th Cir.2007) (holding that there was no "reasonable basis" for terminating benefits based solely on having file reviewed by physician where plaintiff had submitted voluminous medical evidence of disability based on years of visits with treating physicians); *Evans v. UnumProvident Corp.,* 434 F.3d 866, 877 (6th Cir.2006) (giving more weight to medical opinions based on physical examinations than opinions based solely upon file review)

For this reason, the court finds the opinions of the physicians who believe Plaintiff to be totally disabled to be more persuasive than the physicians whose opinions were relied upon by MetLife.[9]

Overall, the court finds that the weight of all the evidence in the record indicates that Plaintiff is, in fact, totally disabled. Defendant has produced no evidence that show that MetLife did, as required by law, consider all of Plaintiff's multiple severe medical conditions in conjunction with another in determining that she was not disabled. Every prior body called upon to make an administrative decision on whether or not Plaintiff was disabled has found that she was in fact totally disabled. Every physician who has personally treated Plaintiff has determined that she is totally disabled. While Plaintiff's pacemaker undoubtedly improved the situation and

---

9. In the interests of clarity, the court emphasizes that it does not find these physicians more persuasive simply because they are Plaintiff's treating physicians. Instead, it finds their opinions more persuasive for the simple fact that they have more information upon which to base such opinions than physicians who only have the benefit of a written record.

Plaintiff no longer passes out as a result of her neurocardiogenic syncope, she does continue to suffer circulation problems from the condition, including lightheadedness and nausea. (AR 58–59.) She suffers from debilitating migraines and asthma, which evidence shows have gotten worse since her neurocardiogenic syncope required her to leave the work force. Considering all of these factors together under the *de novo* standard of review, the court concludes that MetLife was in error in terminating Plaintiff's disability benefits, and said benefits should be reinstated pursuant to 29 U.S.C. § 1132(a)(1)(B).

### *CONCLUSION*

For the foregoing reasons, the court finds that MetLife's termination of Plaintiff's disability benefits was in error and not supported by the evidence in the record. Accordingly, the court directs entry of judgment in favor of Plaintiff, and awards Plaintiff disability benefits under the Plan retroactive to March 15, 2005.

**AND IT IS SO ORDERED.**